¶ 1.
PATIENCE DRAKE ROGGENSACK, C.J.
Regency West Apartments, LLC brought actions against the City of Racine in circuit court pursuant to Wis. Stat. § 74.37(3)(d) (2011-12)[1] to recover refunds from claimed excessive taxation for 2012 and 2013. We review a per curiam, unpublished decision of the court of appeals,[2] affirming an order of the Racine County Circuit Court[3] that dismissed Regency West's claims of excessive taxation.[4]
¶ 2. The City of Racine's appraisers valued Regency West's property at $4,425,000 as of January 1, 2012 and at $4,169,000 as of January 1, 2013 for purposes of tax assessment. Regency West claims both appraisals fail to comply with appraisal principles *289 required by Wisconsin law, and that those appraisals resulted in excessive taxation.
f 3. Our discussion centers on whether Racine's appraisals of Regency West's property comply with Wisconsin law. Specifically, we review whether Racine employed the methodology required by Wis. Stat. § 70.32(1) for valuing federally subsidized property that is subject to I.R.C. § 42 restrictions;[5] whether Regency West has overcome the presumption of correctness set out in Wis. Stat. § 70.49; and whether Regency West proved the tax assessments for 2012 and 2013 were excessive.
¶ 4. We conclude that the valuation methodologies Racine used for the 2012 and 2013 assessments did not comply with Wisconsin law. Accordingly, we also conclude that Regency West has overcome the presumption of correctness for the 2012 and 2013 tax assessments, and that the circuit court and the court of appeals erred in concluding otherwise. And, finally, we conclude that Regency West has proved that Racine's tax assessments for 2012 and 2013 were excessive. Accordingly, we reverse and remand to the circuit court to calculate the amount of Regency West's refund.
I. BACKGROUND
f 5. Regency West is the owner and developer of a property located in Racine, Wisconsin. Regency West constructed the property in 2010-11, with the first units placed in service September of 2011, and the project being fully leased in February of 2012.
*290 ¶ 6. The property has 9 two-story buildings consisting of 72 residential units, all of which are family units. All units are federally regulated housing pursuant to I.R.C. § 42. These federal regulations include income and rent restrictions. As part of the restrictions, the property is subject to a Land Use Restriction Agreement (LURA) that provides that for 30 years, 51 of the 72 units are restricted to tenants earning up to 50 percent of the median income in Racine County and 21 are restricted to tenants earning up to 60 percent of the median income in Racine County. The maximum rents that Regency West may charge are set by Wisconsin Housing and Economic Development Authority (WHEDA).
¶ 7. For purposes of assessing real estate taxes, Racine's appraisers valued Regency West's property at $4,425,000 as of January 1, 2012 and at $4,169,000 as of January 1, 2013. Regency West contested both tax assessments, claiming that the appraisals that underlie the tax assessments did not comply with Wisconsin law. Regency West did not challenge the 2012 assessment before the board of review because Racine did not timely deliver the assessment to Regency West. However, Regency West did challenge the 2013 assessment before the board of review. The board upheld that tax assessment.
¶ 8. The matter now before us is Regency West's refund action brought in circuit court pursuant to Wis. Stat. § 74.37(3)(d). Therefore, we review the record made in the circuit court and the circuit court's determination, not the determination of the assessor or the board of review. See Nankin v. Vill. of Shorewood, 2001 WI 92, ¶¶ 24-25, 245 Wis. 2d 86, 630 N.W.2d 141.
*291 ¶ 9. Trial testimony turned on various methods of real estate appraisal by which the value of Regency West could be determined. The City presented testimony from its assessor, Janet Scites, as well as the Chief Assessor for the City of Racine, Ray Anderson. Scites testified that for 2012 she applied a direct capitalization of income approach, using "mass appraisal techniques."[6] With a direct capitalization of income approach to valuation, an appraiser computes the property's net operating income (income less expenses or NOI) and divides it by the applicable capitalization rate (ratio between NOI of comparable properties and their sale prices).[7]
¶ 10. One of Regency West's construction lenders provided estimates of potential gross income and expenses to Racine for use in the 2012 valuation. However, Racine's assessor said that the expense projections in that report were too high. Accordingly, Scites applied a 40 percent estimated expense ratio that she believed was reflective of other Section 42 properties. She testified that she did so "to stabilize expenses."
¶ 11. Racine's assessor used a 6 percent capitalization rate derived from market-rate properties, not from the market for Section 42 properties.[8] To this, Scites added the 2.5 percent property tax rate, for a *292 loaded capitalization rate of 8.5 percent.[9] Racine's appraisers divided the NOI they calculated based on "stabilized expenses" by an 8.5 percent capitalization rate thereby yielding a value of $4,425,000 for 2012.
¶ 12. With respect to the 2013 assessment, Racine valued Regency West's property at $4,169,000 as of January 1, 2013. The City's assessors used the comparable sales approach, rather than the income approach, to appraise the property. They relied on the sales of three properties, which they claimed were reasonably comparable properties.
¶ 13. One of the properties, Lake Oakes, had few Section 42 housing units; most were market-rate units. The other two properties the City's assessors relied on, Woodside Village/Albert House and McMynn Tower, had no Section 42 units. Each of those developments was either entirely HUD § 8 housing or HUD § 8 housing with a small number of commercial units.[10] The assessor did not adjust for differences in government restrictions on the different types of federally regulated housing when appraising Regency West's property. Instead, Scites testified that she considered the restrictions for Section 8 and Section 42 properties to be sufficiently similar.
*293 ¶ 14. Racine also presented the testimony of two outside appraisers, Peter Weissenfluh and Dan Fur-dek. The outside appraisers used four appraisal methods for both their 2012 and 2013 assessments. First, Weissenfluh and Furdek used the comparable sales approach. The appraisers relied on a combination of Section 42 and Section 8 properties, and Furdek testified that he believed the restrictions on the properties were irrelevant as long as the rental income from the properties was the same. Next, they used two variations of the income approach: the direct capitalization method and the discounted cash flow method. Finally, they used the cost approach. Each of Furdek and Weissenfluh's valuations resulted in higher valuations than Racine's.
¶ 15. In contrast, Regency West argued that it had overcome the presumption of correctness afforded the City's tax assessment for two reasons. First, the City had failed to comply with the Wisconsin Property Assessment Manual (WPAM)[11] in its appraisals of Regency West's property as Wis. Stat. § 70.32(1) requires. Second, Regency West presented sufficient contrary evidence that Racine's appraisals were excessive. In that regard, Regency West presented testimony from Michael Lerner and, its appraiser, Scott McLaughlin. Michael Lerner has vast experience working with Section 42 housing whereas Scott McLaughlin specializes in appraising subsidized housing. Relying solely on the income approach, which he explained was consistent with WPAM, McLaughlin appraised the property at $2,700,000 for 2012 and $2,730,000 for 2013.
*294 f 16. At the conclusion of the trial, the circuit court dismissed Regency West's excessive tax claims for both years. The circuit court concluded that Regency West had failed to overcome Wis. Stat. § 70.49's presumption of correctness given to the 2012 and 2013 tax assessments.
¶ 17. The circuit court found that Racine did not do an individual valuation of Regency West's property for 2012, but instead, it "applied mass appraisal techniques." The court found that Scites "estimated expenses based upon her experience and used a capitalization rate of 8.5%." The court then concluded that "[d]ue to the number of assessments needed to be done (7,500), the City used mass appraisal techniques, [which was] an appraisal method approved by the Property Assessment Manual for commercial property" in arriving at $4,425,000 as the property's value in 2012.
¶ 18. The court of appeals affirmed the circuit court's dismissal of Regency West's complaint. With respect to the 2013 assessment, the court rejected Regency West's argument that Section 42 and Section 8 properties are not reasonably comparable for purposes of the comparative sales approach. The court reasoned that both types of subsidized housing are found within the same section of the WPAM, and Racine's assessors had opined that the rents from all the properties were essentially the same. With respect to the 2013 assessment, the court concluded that reliance on market-rate properties for the NOI was immaterial because Racine used the comparative sales approach for that valuation; and for 2012, reliance on a market-rate NOI was reasonable because Regency West was newly constructed and did not have actual expenses to consider.
*295 ¶ 19. Consequently, the court of appeals concluded that Regency West had not overcome the presumption of correctness accorded to tax assessments by Wis. Stat. § 70.49 and, therefore, Regency West was unable to show that its 2012 and 2013 tax assessments were excessive.
¶ 20. We granted Regency West's petition for review and now reverse.
II. DISCUSSION
A. Standard of Review
¶ 21. This is a refund action commenced under Wis. Stat. § 74.37(3)(d). It permits "an aggrieved person to recover that amount of general property tax imposed because the assessment of property was excessive." Wis. Stat. § 74.37(1). A claim for excessive assessment is a "new trial, not a certiorari action." Trailwood Ventures, LLC v. Vill. of Kronenwetter, 2009 WI App 18, ¶ 6, 315 Wis. 2d 791, 762 N.W.2d 841. Therefore, "we review the record made before the circuit court, not the board of review." Adams Outdoor Advert., Ltd. v. City of Madison, 2006 WI 104, ¶ 24, 294 Wis. 2d 441, 717 N.W.2d 803 (citing Nankin, 245 Wis. 2d 86, ¶ 25).
¶ 22. As we review the record made in the circuit court, we interpret and apply Wis. Stat. § 70.32 to determine whether Racine's appraisals for 2012 and 2013 followed the statute's directives. We also interpret Wis. Stat. § 70.49(2) to determine whether Regency West has overcome the presumption of correctness that attached to Racine's tax assessments. *296 Statutory interpretation and application present questions of law that we independently review, while ben-efitting from the analyses of the court of appeals and the circuit court. Oneida Cty. Dep't of Soc. Servs. v. Nicole W., 2007 WI 30, ¶ 9, 299 Wis. 2d 637, 728 N.W.2d 652; see also Soo Line R.R. Co. v. DOR, 97 Wis. 2d 56, 59-60, 292 N.W.2d 869 (1980).
B. General Appraisal Principles
¶ 23. "The power to determine the appropriate methodology for valuing property for taxation purposes lies with the legislature." Walgreen Co. v. City of Madison, 2008 WI 80, ¶ 19, 311 Wis. 2d 158, 752 N.W.2d 687. Wisconsin Stat. § 70.32(1) provides that "property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual." "The Manual, in turn, provides that '[t]he goal of the assessor is to estimate the market value of a full interest in the property, subject only to governmental restrictions. All the rights, privileges, and benefits of the real estate are included in this value. This is also called the market value of a fee simple interest in the property.' " Walgreen, 311 Wis. 2d 158, ¶ 20 (quoting 1 Wisconsin Property Assessment Manual (2007) at 7-4).
f 24. The objective of an appraisal is to determine "the full value" that an owner would receive at a "private sale." Wis. Stat. § 70.32(1). For purposes of determining full value, property is separated into seven classifications based on use. Wis. Stat. § 70.32(2). Regency West is residential property. § 70.32(2)(a)l.
*297 ¶ 25. Wisconsin Stat. § 70.32(1) provides the methodological framework that appraisers must follow when appraising property. It delineates a three-tier approach:
In determining the value, the assessor shall consider recent arm's-length sales of the property to be assessed if according to professionally acceptable appraisal practices those sales conform to recent arm's-length sales of reasonably comparable property; recent arm's-length sales of reasonably comparable property; and all factors that, according to professionally acceptable appraisal practices, affect the value of the property to be assessed.
Wis. Stat. § 70.32(1); see also State ex rel. Markarian v. City of Cudahy, 45 Wis. 2d 683, 686, 173 N.W.2d 627 (1970).
| 26. "An assessor has an obligation to follow the three tier assessment analysis." Adams, 294 Wis. 2d 441, ¶ 47. Nevertheless, this hierarchy of appraisal methods does not permit an assessor to use an appraisal method when insufficient data exist to perform an accurate valuation under that method. To the contrary, an assessor must not appraise a property using unreliable data. Metro. Holding Co. v. Bd. of Review of City of Milwaukee, 173 Wis. 2d 626, 631-32, 495 N.W.2d 314 (1993).
f 27. Under the first tier of appraisal methods set out in Wis. Stat. § 70.32(1), an appraiser should rely on recent arm's-length sales of the subject property to determine the property's value. This approach is universally considered the most reliable method of appraising property. Markarian, 45 Wis. 2d at 686. *298 However, both parties agree that this method is not at issue in the present case because there were no sales of the subject property to consider.
¶ 28. Under the second tier of appraisal methods, an appraiser values a property by considering recent, arm's-length sales of "reasonably comparable" properties. Id.; 1 Wisconsin Property Assessment Manual at 9-45. The WPAM defines "reasonably comparable" properties as those properties that represent the "subject property in age, condition, use, type of construction, location, design, physical features and economic characteristics." 1 Wisconsin Property Assessment Manual at 7-22.
f 29. Moreover, "if there has been no arms-length sale and there are no reasonably comparable sales [] an assessor [may] use any of the third-tier assessment methodologies." Adams, 294 Wis. 2d 441, ¶ 34. "The income approach, which seeks to capture the amount of income the property will generate over its useful life, and the cost approach, which seeks to measure the cost to replace the property, both fit into this analytic framework." Id., ¶ 35.
¶ 30. However, when valuing subsidized housing, the WPAM suggests that the "Cost Approach is the least reliable valuation method" because of "the difficulty in estimating external obsolescence." 1 Wisconsin Property Assessment Manual at 9-45. Accordingly, an assessor should apply the cost approach when evaluating subsidized housing only when other approaches are not available.[12]
*299 ¶ 31. Because an appraiser must consider all aspects of the subject property that may affect its value, appraisers must consider whether a property's value is affected by its classification as residential property subject to Section 42 subsidized housing restrictions. See Metro. Holding, 173 Wis. 2d at 631-32.
¶ 32. The income approach is often the most reliable method for assessing subsidized housing. 1 Wisconsin Property Assessment Manual at 9-45 ("The income approach may be the most useful method for valuing subsidized housing. . . ."). The income approach is superior when applied to subsidized housing "due to the conditions of the agreement and the limited availability of data." Id.
¶ 33. The WPAM recognizes dissimilarities between subsidized properties and market-rate properties. It instructs that federally regulated properties are to be treated "as a separate market and distinct from conventional (market level) projects." 1 Wisconsin Property Assessment Manual at 9-42. Specifically, federally regulated properties have "operational constraints (regulations) and risk factors that are different from a market rate property." Id. As such, appraisals that fail to account for differences between those properties and market-rate properties contravene the WPAM and Wis. Stat. § 70.32. Metro. Holding, 173 Wis. 2d at 630-32.
*300 ¶ 34. The WPAM provides that to be "reasonably comparable," other properties must have "similar restrictions" to the subject property. 1 Wisconsin Property Assessment Manual at 9-45 ("To be considered [reasonably] comparable, the recent arm's-length sales should have restrictions similar to the subject property."). With these foundational principles in mind, we turn to the 2012 and 2013 appraisals that underlie the tax assessments for Regency West's property.
C. Regency West's Property
1. 2012 tax assessment
¶ 35. Regency West placed its first units in service September of 2011, and the project was fully leased in February of 2012. Both Racine and Regency West valued the subject property as of January 1, 2012, using the income approach. However, they did not apply it in the same way. First, Racine did not do an individualized appraisal of Regency West's property, but instead, employed "mass appraisal techniques" because its appraisers had 7,500 properties to value in 2012. Regency West's appraisal was based on the subject property. Second, Racine did not consider the projected expenses and income for the subject property when calculating its NOI. Regency West used projected expenses and income for the subject property. Third, Racine employed a capitalization rate based on market-rate properties; Regency West applied a capitalization rate derived from a Section 42 housing market.
f 36. In calculating Regency West's NOI for 2012 under its mass appraisal technique, the City's appraiser used market-rate vacancy and market-rate *301 expenses instead of the vacancy and expense projections that were specific to the subject property. This approach fails to account for the vast differences in federally regulated housing discussed above and distorts the actual value of Regency West's property.
¶ 37. An appraiser must not value federally regulated housing as if it were market-rate property. Doing so causes the assessor to "pretend" that the subject property is not hindered by federal restrictions. Metro. Holding, 173 Wis. 2d at 631; see also 1 Wisconsin Property Assessment Manual at 9-45 ("Any income approach used must consider all the impacts of the subsidy program."). The restrictions and underlying agreements implicit in federally regulated housing will affect the property's value. See Bloomer Hous. Ltd. P'ship v. City of Bloomer, 2002 WI App 252, ¶ 31, 257 Wis. 2d 883, 653 N.W.2d 309 ("An assessor must consider the effects of the restrictions on subsidized housing."); Walworth Affordable Hous., LLC v. Vill. of Walworth, 229 Wis. 2d 797, 802-03, 601 N.W.2d 325 (Ct. App. 1999) (reasoning that because the subject "property is encumbered with income and rental restrictions resulting from the [Federal Housing Tax Credits], these restrictions must be considered in the property's valuation."). As discussed above, the WPAM recognizes these differences and directs that assessors are not to treat federally regulated housing as if it were market-rate housing for purposes of determining property values. 1 Wisconsin Property Assessment Manual at 9-42 ("Subsidized housing properties operate differently than conventional (market-rate) properties.").
*302 ¶ 38. Our decision in Metropolitan Holding unambiguously requires assessors to use income and expenses for the subject property when valuing subsidized housing under the income approach. Metro. Holding, 173 Wis. 2d at 634 (remanding the "case with instructions that [t]he Board order the city assessor to assess Layton Garden using the capitalization of income approach based on actual income and expenses").
¶ 39. In Metropolitan Holding, the plaintiff, Lay-ton Garden, argued that its property was valued artificially high because the City of Milwaukee had relied on market-rate expenses when determining the property's NOI. Id. at 630. We agreed with Layton Garden and overturned the City of Milwaukee's tax assessment based on that valuation. Id. We reasoned that by employing market-rate rents and market-rate expenses, the city assessor "pretended that Layton Garden was not hindered by the HUD restrictions and valued the property at the amount the property would bring in an arm's-length transaction if Metropolitan were able to charge market rents." Id. at 631; see also Mineral Point Valley Ltd. P'ship v. City of Mineral Point Bd. of Review, 2004 WI App 158, ¶ 11, 275 Wis. 2d 784, 686 N.W.2d 697 (concluding that the assessor must value properties individually, not based on hypothetical income and expenses (citing Metro. Holding, 173 Wis. 2d at 629)).
¶ 40. Wisconsin Stat. § 70.32(1) requires assessors to value property based on "the best information that the assessor can practicably obtain." Here, there was available to Racine's assessor projected expenses and income for this newly opened property. However, Racine chose not to employ that information and chose instead to calculate the NOI for its income-based *303 valuation through mass appraisal techniques that were not particularized to Regency West's property. We conclude that in that regard, Racine did not comply with the directive of § 70.32(1) because it did not use the "best information" that was available to its assessor.
¶ 41. In contrast to the City's approach, Regency West used income and expenses specifically projected for the subject property when it calculated the NOI for its income-based valuation. These projected expenses are the best information that could practicably be obtained. We conclude that for this newly opened property, the use of projected expenses complies with the mandate of Wis. Stat. § 70.32(1).
¶ 42. In addition to calculating a NOI for the subject property, an income-based valuation requires determining the applicable capitalization rate. Therefore, we consider whether appraisers, when valuing federally regulated properties, may derive the capitalization rate from market-rate properties. We conclude that they may not.
¶ 43. The capitalization rate expresses the rate of return an investor would expect to receive from an investment in the subject property. 1 Wisconsin Property Assessment Manual at 9-21. The determination of the applicable capitalization rate is a critical element in determining the value of a property because a small change in capitalization rate will create a significant change in a property's value. This is so because the value of a subject property is determined by dividing its NOI by the applicable capitalization rate, which rate is expressed as a percentage. Id. Therefore, a larger percentage will yield a smaller total value for the property.
*304 ¶ 44. When determining the applicable capitalization rate, assessors must consider factors that appreciably alter the value of the property. Otherwise, the capitalization rate will not truly represent the risk an investor is undertaking when investing in the property.
¶ 45. "Capitalization rates from the marketplace are usually derived from the sale of market-rate projects." Id. at 9-45. Such capitalization rates "do not reflect the unique characteristics of subsidized housing. In some cases there can be more risk in subsidized housing, in other cases there is less." Id. The WPAM further explains, "Rent levels are often regulated and annual increases may be difficult to obtain. In many cases the proportion of debt to equity is different in subsidized projects than in market rate projects. With some types of projects the amount of annual equity return is limited (called a limited dividend)." Id. Additionally, for some types of federally regulated housing, "equity investors primarily look to other sources beyond the cash flow of the property for their required return on investment." Id.
¶ 46. Appraisers who fail to consider property classified as federally regulated housing and the restrictions attendant thereto when deriving capitalization rates are overlooking major characteristics of such property. After all, a property's classification as federally regulated housing may substantially impact the risks associated with the property, thereby altering the market for the property.
¶ 47. Moreover, as discussed above, the WPAM prohibits appraisers from using market-rate properties when valuing federally regulated housing. As a *305 corollary, appraisers may not derive a capitalization rate from market-rate properties. Rather, appraisers should use "recent market value sales of similar properties" to determine the capitalization rate. Id. at 9-24. Therefore, when valuing a property using the income approach, appraisers must use capitalization rates derived from a market consistent with the market for the subject property.[13]
¶ 48. The City assessor used 6 percent as a base capitalization rate, which she derived through mass appraisal techniques of market-rate properties. The assessor then added 2.5 percent, which is the tax rate for Regency West, yielding a loaded capitalization rate of 8.5 percent.[14]
¶ 49. Both the circuit court and the court of appeals approved the 6 percent base rate. They relied *306 on Mineral Point Valley from which they concluded that the applicable capitalization rate must be derived from market-rate properties.[15] The court of appeals also relied on Bischoff v. City of Appleton, 81 Wis. 2d 612, 260 N.W.2d 773 (1978). Their reliance on either Mineral Point Valley or Bischoff is misplaced, and it also fails to comply with our decision in Metropolitan Holdings discussed in some detail above.
¶ 50. Mineral Point Valley considered competing arguments about which interest rate should be used when establishing a capitalization rate based on the underlying mortgage for a HUD § 515 property.[16] Mineral Point Valley, 275 Wis. 2d 784, f 8. The partnership had obtained a 50-year mortgage at 8.75 percent. Id. ¶ 3. As part of the HUD program, the federal government subsidized the partnership for 7.75 percent of that interest. Id. Because of the subsidy, the city assessor used 1 percent as the capitalization rate and the partnership used 8.75 percent. The court of appeals precluded the use of 1 percent as the capitalization rate. Id., ¶ 13.
¶ 51. Mineral Point Valley did not involve a direct capitalization of income approach, which is the type of capitalization approach all parties have used in the case before us for 2012. Mineral Point Valley had nothing to do with whether market-rate properties or Section 42 properties should establish the market from which sales and NOIs were obtained when determining the applicable capitalization rate for federally *307 regulated housing.[17] Therefore, Mineral Point Valley should not be read to have concluded that an appraiser may calculate a capitalization rate from market-rate properties when valuing federally regulated property.
¶ 52. In the case at hand, the City's assessors used a capitalization rate derived from market-rate properties when appraising Regency West's federally regulated property for 2012. The City's assessors should have used a market for Section 42 properties to determine the capitalization rate. See Metro. Holding, 173 Wis. 2d at 634. Instead, the assessors used a capitalization rate provided by a brokerage firm, which did not account for the property's classification as subsidized housing. As a result, the City's assessors' use of a 6 percent base capitalization rate was not in compliance with Wis. Stat. § 70.32(1) or with the WPAM. Taxing authorities are required to comply with the law when valuing properties, and failing to do so negates the presumption of correctness that Wis. Stat. § 70.49 otherwise accords. Allright Props., Inc. v. City of Milwaukee, 2009 WI App 46, ¶ 12, 317 Wis. 2d 228, 767 N.W.2d 567 (citing Walgreen, 311 Wis. 2d 158, ¶ 17).
f 53. The court of appeals, relying on our decision in Bischoff concluded that an appraiser's sole reliance on an income approach to valuation was improper. The court of appeals' reliance on Bischoff is understandable, but misplaced.[18]
*308 ¶ 54. Bischoff arose in the context of demurrer where we held that a complaint that alleged error in the use of the income approach for valuation when there had been an arm's-length sale was timely filed. Bischoff, 81 Wis. 2d at 619-20. We never concluded that an income approach could not be used as the sole method of valuation in all cases. See also Northland Whitehall Apts. Ltd. P'ship v. City of Whitehall Bd. of Review, 2006 WI App 60, ¶ 25, 290 Wis. 2d 488, 713 N.W.2d 646 ("the 'income approach' as utilized by its appraiser has also been recognized by the courts ... as a valid method of determining the value of subsidized housing projects").
¶ 55. Furthermore, Bischoff did not address subsidized housing. As we have explained, because of the difficulty in appraising subsidized properties under other appraisal methods, the income approach may be the best determiner of value. And, the WPAM does not preclude appraisers from relying solely on the income approach when valuing subsidized properties. We have recognized that a single valuation approach under the third tier may be appropriate. Adams, 294 Wis. 2d 441, ¶ 53 ("There may be situations in which the only information available compels an assessor to use a single methodology to [value] property.").
¶ 56. By contrast, Regency West's expert utilized a market for Section 42 properties when constructing the applicable capitalization rate. In that market, Section 42 property base capitalization rates averaged 7.4 percent for senior properties (with a high of 8.4 percent and a low of 5.9 percent) and averaged 7.57 percent for family property (with a high of 8.83 percent *309 and a low of 6.59 percent). Regency West's expert used a base capitalization of 8 percent for 2012. He then added the same tax rate of 2.54 percent, and employed a loaded rate of 10.54 percent in his income-based 2012 valuation. Determining the capitalization rate in this manner complied with the WPAM as Wis. Stat. § 70.32(1) requires.
¶ 57. Based on its expert's calculations described above, Regency West valued its property at $2,700,000 as of January 1, 2012. Racine's valuation of $4,425,000 was derived from a procedure that did not comply with Wis. Stat. § 70.32(1) and the WPAM; Regency West's valuation followed the requirements of § 70.32(1) and WPAM in its valuation. Regency West's appraisal is the best evidence of the property's value.[19] Accordingly, we conclude that Regency West has shouldered its burden to show that Racine's taxation for 2012 was excessive and a refund is due.
2. 2013 tax assessment
¶ 58. Although both parties employed the income approach to valuation for 2012, only Regency West did so for 2013. Racine applied a comparative sales approach for its 2013 assessment. Regency West argues that the properties the City's appraiser relied on, *310 primarily Section 8 properties, were not reasonably comparable to the subject property, which is Section 42 housing. For the reasons discussed below, we conclude that Section 8 and Section 42 properties are not "reasonably comparable," and therefore the City incorrectly applied the comparative sales approach when valuing Regency West's property for 2013.
¶ 59. It is the legislature that required the use of "recent arm's-length sales of reasonably comparable property" when an appraiser is valuing a property under the second tier method. Wis. Stat. § 70.32(1). And in addition, § 70.32(1) also requires consideration of "all factors that, according to professionally acceptable appraisal practices, affect the value of the property."
¶ 60. If there are no "reasonably comparable" properties, the comparable sales approach cannot be used. Allright Props., 317 Wis. 2d 228, ¶ 29. That is, an appraiser cannot accurately value a property using data from the sales of properties that are not "reasonably comparable" to the subject property. Absent comparable sales, an appraiser must apply the third tier for valuing property. Id.
¶ 61. The WPAM does not leave the determination of whether properties are reasonably comparable wholly to the discretion of an appraiser. It provides appraisers with instructions for assessing subsidized properties under the comparable sales approach. To obtain the necessary information, an appraiser "may have to perform a statewide search to find comparable sales." 1 Wisconsin Property Assessment Manual at 9-45. An appraiser can obtain this information "by *311 viewing website data and by calling other assessors who have similar subsidized housing in their jurisdictions." Id.
¶ 62. The WPAM explicitly states when subsidized properties are reasonably comparable: properties being compared must have "restrictions similar to the subject property." Id. To determine if properties have similar restrictions, an appraiser must examine the specific restrictions that apply to each property, as well as the differences between these restrictions. And, an appraiser must consider the nature of these restrictions and the ways in which these restrictions affect the value of each property. This also suggests that an appraiser should not compare subsidized property to non-subsidized property as non-subsidized property lacks the restrictions subsidized property carries. We have explained the necessity of understanding the specific restrictions appurtenant to federally regulated property when appraising such property. Metro. Holding, 173 Wis. 2d at 631-32. The failure of an appraiser to consider the restrictions specific to the subject property is a failure to follow Wisconsin law. We now examine whether two specific classifications of subsidized housing, Section 8 and Section 42, are "reasonably comparable."[20]
¶ 63. Section 42 is a United States Treasury program that promotes the development of affordable housing by allowing an owner to receive federal tax credits for developing a parcel of land into Section 42 *312 housing.[21] The credits can be exchanged for equity in the property, which allows the owner to reduce construction debt with equity financing. Under the Section 42 program, investors receive "a dollar-for-dollar reduction in federal tax liability... in exchange for equity participation in low-income rental housing." 1 Wisconsin Property Assessment Manual at 9-40.
¶ 64. Section 42 "credits come with many restrictions." Id. For example, in Wisconsin the owner is required to enter into a LURAthat obligates the owner to maintain the project for 30 years with rent-restricted units for income-qualified tenants. Id.
¶ 65. In contrast, Section 8 is a rent subsidy program. "Project owners receive a rental subsidy payment under Housing Assistance Payment Contract (HAP Contract) that range from 15 to 40 years." Id. at 9-42. The property owner is required to rent Section 8 units to tenants from low or very low-income families. "Families whose incomes do not exceed 80% of the median income in the area are defined as low-income; very low-income families do not exceed 50% of the median income." Id.
¶ 66. Section 8 properties are generally a low risk investment. The risk is low, in part, because the federal government insures the owners of Section 8 housing against the possibility that their tenants will fail to pay rent.
¶ 67. In sum, Section 42 and Section 8 are vastly different subsidized housing programs, with different risks for the owners. Section 42 is a tax credit program; Section 8 is a subsidy program. Section 42 is a riskier investment because the government does not insure *313 against non-payment of rents. In contrast, the government guarantees much of the rents of Section 8 properties. Unlike owners of Section 8 properties, Section 42 owners are required to enter into a 30-year LURA. Regency West's expert testified that these differences lead to vastly different markets for the two types of properties.
f 68. In the case before us, the City's assessors relied on the sales of three properties: Lake Oakes, Woodside Village/Albert House and McMynn Tower. Lake Oakes possesses few Section 42 housing units; most units are market-rate rentals. Woodside Village/Albert House and McMynn Tower have no Section 42 units. One property was entirely Section 8 housing and the other was Section 8 housing with a few commercial units. Therefore, their sales were not representative of "reasonably comparable" arm's-length sales as the second tier of Wis. Stat. § 70.32(1) and the WPAM require.
¶ 69. Moreover, the City's assessors did not consider the varying restrictions federal regulations require when valuing Regency West's property. Rather, Scites testified that Section 42 and Section 8 properties have similar restrictions. Scites relied almost entirely on the properties' similar rates of rent, without recognizing that Section 8 rents are subsidized by the government and Section 42 rents are not. Furthermore, nothing in the WPAM or Wisconsin law equates "reasonably comparable" with "similar rents." The failure of Racine to consider the properties' restrictions caused the three sales Scites relied on to fall outside the parameters of reasonably comparable sales.
¶ 70. The City was required to consider the various restrictions on subsidized properties. And, as a *314 matter of law, Section 8 and Section 42 do not possess the same restrictions. The City's 2013 assessment of the subject property relied totally on its assertion that the sales of Lake Oakes, Woodside Village/Albert House and McMynn Tower were sales of reasonably comparable properties. As we have explained above, WPAM explains the differences those properties have from Regency West's property such that they are not reasonably comparable. Accordingly, Scites' 2013 appraisal was completed in violation of Wisconsin law and the WPAM. The circuit court erroneously concluded that the City's assessors complied with Wisconsin law.[22]
f 71. We conclude that Scites' 2013 appraisal failed to follow Wisconsin law and the WPAM, negating the presumption of correctness otherwise available in Wis. Stat. § 70.49. Allright Props., 317 Wis. 2d 228, ¶ 12.
f 72. Regency West argues that it has presented the only evidence of its property's value as of January 1, 2013 that complies with Wisconsin law and the WPAM. We agree. It did so in its third tier direct capitalization of income appraisal. That appraisal employed actual expenses and income for the property upon which the NOI was calculated, and it derived its capitalization rate from a market for Section 42 properties. Regency West's appraisal determined that the property's value was $2,730,000 as of January 1, 2013. This is sufficient evidence to meet Regency West's *315 burden to show that the City's tax assessment was excessive and accordingly a refund is due.[23]
III. CONCLUSION
¶ 73. We conclude that the valuation methodologies Racine used for the 2012 and 2013 assessments did not comply with Wisconsin law. Accordingly, we also conclude that Regency West has overcome the presumption of correctness for the 2012 and 2013 tax assessments, and that the circuit court and the court of appeals erred in concluding otherwise. And, finally, we conclude that Regency West has proved that Racine's tax assessments for 2012 and 2013 were excessive. Accordingly, we reverse and remand to the circuit court to determine the amount of the refund due Regency West.
By the Court.—The decision of the court of appeals is reversed and remanded.

 All subsequent references to the Wisconsin Statutes are to the 2011—12 version unless otherwise indicated.

 Regency West Apts. LLC v. City of Racine, No. 2014AP2947, unpublished slip op. (Wis. Ct. App. Sept. 16, 2015).

 The Honorable Gerald R Ptacek of Racine County presided.

 Regency West commenced separate refund actions for 2012 and 2013, which were consolidated for trial.

 I.R.C. § 42 provides "a dollar-for-dollar reduction in federal tax liability for investors in exchange for equity participation in low-income rental housing." 1 Wisconsin Property Assessment Manual at 9-40; see 26 U.S.C. § 42.

 Mass appraisal techniques have been used to value all properties in a taxing district using uniform benchmarks. Standard on Mass Appraisal of Real Property, 2013, International Ass'n of Assessing Officers.

 The capitalization rate is an estimate of the rate of return an investor would expect in order to invest in the subject property.

 Ray Anderson testified that the capitalization rate was given to them by a brokerage firm in Southeastern Wisconsin.

 The Wisconsin Property Assessment Manual (WPAM) requires that an appraiser add the effective tax rate to create the loaded capitalization rate for the subject property when doing an income-based valuation. 1 Wisconsin Property Assessment Manual at 9-23.

 HUD § 8 housing has entirely different restrictions than does Section 42 housing. For example, Section 8 properties do not have tenant income or rent restrictions, and the government provides rent subsidies when tenant income is insufficient to pay the rent charged. Compare 42 U.S.C. § 1437f (HUD § 8) with 26 U.S.C. § 42 (I.R.C. § 42).

 All references to the Wisconsin Property Assessment Manual are to the 2011 version unless otherwise indicated.

 Wisconsin Stat. § 70.32(lg) prohibits assessors from considering the effect of Section 42 tax credits when valuing *299 property. It is nearly impossible to apply the "cost approach" to subsidized housing because the "cost approach" requires an appraiser to examine the cost of replacing the property, which will necessarily be impacted by the tax credits an owner receives in return for constructing the property.

 The market of properties an appraiser may consider when determining the capitalization rate will often be broader than the market of properties that are reasonably comparable to the subject property. The WPAM does not require an appraiser to consider the specific restrictions attendant to each property an appraiser relies on to determine the capitalization rate; the property manual requires that the properties the appraiser relies on be "similar." See 1 Wisconsin Property Manual at 9-24 (stating that an appraiser must use "similar properties" when determining the capitalization rate). Therefore, the capitalization rate may be derived from properties classified as the same type of federal housing as the subject property without considering the property's individualized restrictions. In contrast, whether properties are reasonably comparable for purposes of the comparative sales approach to valuation requires a more exacting analysis. Properties used for valuation under the comparable sales approach must have "restrictions similar to the subject property." Id. at 9-45 (emphasis added).

 Both parties added the City of Racine's tax rate to the base capitalization rate they calculated, as the addition is required by WPAM. 1 Wisconsin Property Assessment Manual at 9-22.

 The circuit court also approved Racine's appraisal for the 2012 income valuation, saying it was ok for "commercial Property." However, under Wis. Stat. § 70.32(2)(a)l., Regency West is classified as residential property, not commercial property, which is set out under Wis. Stat. § 70.32(2)(a)2.

 See 42 U.S.C. § 1485.

 Recall that a market-driven capitalization rate is determined by taking NOIs of comparable properties and dividing those numbers by the sale prices for those properties.

 The court of appeals' rationale that Section 42 and Section 8 programs are similar because they are found within the same section of the WPAM is unconvincing. Both are *308 subsidized housing; however, the similarities between the two programs largely end there. The two programs have vastly different restrictions.

 We do not consider the appraisals of Peter Weissenfluh and Dan Furdek because their appraisals exceeded the valuations of Racine for both 2012 and 2013. See Trailwood Ventures, LLC v. Vill. of Kronenwetter, 2009 WI App 18, ¶¶ 12-13, 315 Wis. 2d 791, 762 N.W.2d 841 (concluding that a taxation district that has accepted the payment it requested has agreed that its taxation value is the maximum value that it may seek; Wis. Stat. § 74.37 permits a refund to the taxpayer or may uphold the status quo, but there is no authority for deficiency judgments).

 The WPAM has a section dedicated to the various subsidized housing credits. 1 Wisconsin Property Assessment Manual at 9-40. This section includes descriptions of the two types of federally regulated properties at issue in this case, Section 42 and Section 8.

 In Wisconsin, Section 42 housing is administered by WHEDA.

 We emphasize that whether an assessor complied with Wisconsin law and the WPAM are questions of law for our independent review. Adams Outdoor Advert., Ltd. v. City of Madison, 2006 WI 104, ¶ 26, 294 Wis. 2d 441, 717 N.W.2d 803.

 Regency West had the burden to show that that assessment was excessive. See Sausen v. Town of Black Creek Bd. of Review, 2014 WI 9, ¶ 20, 352 Wis. 2d 576, 843 N.W.2d 39.