## COURT OF APPEALS
## DECISION
## DATED AND FILED

## May 18, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.  2019AP1232**

Cir. Ct. No.  2014CV3776

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT I**

MAYFAIR MALL LLC,

PLAINTIFF-APPELLANT,

V.

CITY OF WAUWATOSA,

DEFENDANT-RESPONDENT.

APPEAL from a judgment of the circuit court for Milwaukee County: MARSHALL B. MURRAY, Judge.  *Reversed and cause remanded with directions*.

Before Brash, P.J., Dugan and Donald, JJ.

¶1      BRASH, P.J.  Mayfair Mall, LLC, by its member General Growth Properties, Inc. (collectively "GGP"), appeals from a judgment of the trial court in which it concluded that the property assessments of Mayfair Mall (the "Mall"), as determined by the City of Wauwatosa for 2013, 2014, and 2015, were not excessive.

GGP argues that the trial court did not employ the proper standards of valuation in making its determination, and seeks a reversal of the judgment and remand to the trial court for a determination based on the proper standards.

¶2     Upon review of the extensive record in this matter, we conclude that the findings of the trial court are insufficient to allow this court to determine whether the assessments were excessive because the trial court failed to provide and explain its bases for those findings.  We therefore reverse and remand this matter for further fact finding that includes the relevant information and reasoning upon which the court relied in making its findings of fact and conclusions of law.

## BACKGROUND

¶3     GGP purchased the Mall in 1998.  For purposes of assessment, during the timeframe relevant to this appeal, the Mall property included the mall itself; an adjacent restaurant and retailer; a separate parking structure; two separate office buildings; an office building attached to the mall building; and a vacant parcel.

¶4     The assessments of the Mall challenged by GGP were:

| | |
|---|---|
| 2013 | $400,000,000 |
| 2014 | $400,000,000 |
| 2015 | $421,008,500 |

In contrast, for 2011 and 2012, the assessment of the Mall was $286,378,100.

¶5     GGP timely filed claims for excessive assessment with the City for each of the years challenged, but the claims were denied.  GGP then filed the action underlying this appeal.

2

¶6     A court trial was held over approximately six non-consecutive weeks, beginning in May 2017 and concluding in June 2018.  Testimony was heard from the assessor for the City, Steve Miner, who set the assessments for the Mall in 2011, 2012, and 2013, as well as from Shannon Krause, who became the City's assessor after Miner left that position for a position with the City of Milwaukee.  Krause set the assessments for the Mall in 2014 and 2015.  Both assessors explained the methodologies they used in setting the challenged assessments and the information upon which the values were based.[1]

¶7     Additionally, the City retained Mark Kenney, an experienced appraiser, as a consultant regarding the valuation of the Mall.  Kenney had previously appraised two department stores at the Mall—Boston Store and Macy's—and was able to provide "significant information" regarding the Mall property.  Kenney also prepared independent appraisals for the Mall for 2013, 2014, and 2015, and testified at the trial as well.

¶8     Also testifying on behalf of the City as experts were William Miller and Thomas Hamilton, who reviewed the studies and appraisals of the Mall prepared by GGP's experts.  Those experts for GGP included Paul Bakken, who prepared appraisals for the Mall; Peter Korpacz, who performed value studies using income analysis and sales comparisons; James Harkin, who prepared a replacement cost study; and Richard Marchitelli, who performed appraisal analyses.

¶9     The trial court found the appraisals and conclusions presented by the City's assessors and experts to be "more credible, reliable, and persuasive" than those proffered by GGP's experts.  In fact, the trial court concluded that GGP's

---

[1] Further details regarding the assessment methodologies utilized and the information considered by the assessors will be provided throughout this opinion as needed.

experts had "merely provide[d] flawed alternative methodologies" in their valuation of the Mall.

¶10    Furthermore, noting the "presumption of correctness" of the City's assessments that must be overcome to successfully challenge an assessment, the trial court found that GGP's experts did not establish that the Mall was "incorrectly or excessively assessed by the City." The court further found that GGP had failed to establish that the assessors for the City had violated Wisconsin law, or had failed to follow the guidelines of the Wisconsin Property Assessment Manual (WPAM) in setting the assessments.

¶11    As a result, the trial court concluded that GGP had failed to rebut the presumption of correctness afforded the City. Accordingly, the court held that the City's assessments of the Mall for 2013, 2014 and 2015 were not excessive. This appeal follows.

## DISCUSSION

¶12    GGP brought this action pursuant to WIS. STAT. § 74.37(3)(d) (2019-20),[2] which permits the filing of an action with the trial court for a claim of excessive assessment that has been denied by the taxation district. *See id.* Since this is a new action when filed with the trial court as opposed to a certiorari review, our review is of the trial court's decision, not that of the assessor or the Board of Review for the taxation district. *See Metropolitan Assocs. v. City of Milwaukee*, 2018 WI 4, ¶23, 379 Wis. 2d 141, 905 N.W.2d 784.

---

[2] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

¶13     WISCONSIN STAT. § 70.32 directs how property is to be assessed, in accordance with the WPAM.  *See id.*  In our review of a challenged assessment, we "interpret and apply" § 70.32 to ensure that the assessment followed those statutory directives.  ***Regency W. Apartments LLC v. City of Racine***, 2016 WI 99, ¶22, 372 Wis. 2d 282, 888 N.W.2d 611.  Additionally, we apply the provisions of WIS. STAT. § 70.49(2), which provide a "presumption of correctness" that "attache[s]" to the City's assessments.  *See **Regency W.***, 372 Wis. 2d 282, ¶22.  These are questions of law that we review independently, while benefitting from the trial court's analysis.  *See **id.***

¶14     However, we defer to the trial court's findings of fact, and will not overturn them unless they are clearly erroneous.  *See **Metropolitan Assocs.***, 379 Wis. 2d 141, ¶25.  A finding of fact is clearly erroneous "if it is against the great weight and clear preponderance of the evidence."  ***Id.***, ¶62.  Furthermore, it is "within the province of the factfinder to determine the weight and credibility of expert witnesses' opinions."  ***Id.***, ¶25.

¶15     With regard to the application of WIS. STAT. § 70.32, our supreme court has interpreted that statute as establishing a "hierarchical valuation methodology" for appraising properties.  ***Metropolitan Assocs.***, 379 Wis. 2d 141, ¶31.  The "best" information for determining a property's fair market value is an "arm's-length" sale of that property.  ***Id.***, ¶32.  This is referred to as a "Tier 1" analysis.  ***Id.***  If there is no recent sale of the property being assessed, a "Tier 2" analysis may be conducted using sale information for properties that are comparable to the subject property.  ***Id.***, ¶33.

¶16     If neither Tier 1 nor Tier 2 information is available, the assessor may conduct a "Tier 3" analysis.  ***Id.***, ¶34.  For that analysis, "an assessor may consider

all the factors collectively which have a bearing on value of the property in order to determine its fair market value." *Id.* (citations and internal quotation marks omitted). Such factors include "cost, depreciation, replacement value, income, industrial conditions, location and occupancy, sales of like property, book value, amount of insurance carried, value asserted in a prospectus and appraisals produced by the owner." *Id.* (citation omitted).

¶17 A Tier 3 analysis is further divided into two approaches for determining value: the income approach, which "seeks to capture the amount of income the property will generate over its useful life"; and the cost approach, which "seeks to measure the cost to replace the property[.]" *Id.* The income approach generally requires that the assessor determine the net operating income (NOI) for a property for that assessment year. *See id.* The experts in this case explained that the assessor then applies the capitalization rate to the NOI to calculate the assessed value. To determine the appropriate capitalization rate, the experts agreed that the PWC Real Estate Investor Survey—a widely respected and cited reference in that industry—is generally utilized in making that calculation. The experts further explained that the class of the mall, which is based on its retail sales and its earnings for shareholders, is also taken into consideration for this calculation.

¶18 In setting the 2013 assessment for the Mall, Miner conducted analyses using all three tiers. Although there had been no sale of the Mall since GGP purchased it in 1998, an appraisal of the Mall had previously been done by Cushman and Wakefield ("CW appraisal") when GGP had filed for bankruptcy. The CW appraisal was done to provide a post-bankruptcy valuation of all of the assets of GGP—including the Mall—for purposes of reporting the same to the Securities and

Exchange Commission as well as the public;[3] it was not just a general assessment of the Mall property. Nevertheless, that valuation in the CW appraisal was used by Miner to calculate the Mall's value under a Tier 1 analysis; he also utilized the sale information for comparable properties listed in the CW appraisal for conducting his Tier 2 analysis.

¶19 Ultimately, however, Miner determined that the Tier 3 income approach would "produce the most reliable results[.]" Miner believed that the "actual income and expenses" for the Mall would be the "best information" upon which to base the value. Although Miner had "limited information" when he initially set that assessment value because he had not received operating statements or other relevant documentation from GGP, Miner was able to garner some of this information from the CW appraisal, which contained lease information, including rent, for every lease at the Mall.

¶20 Of course, the amount of rent collected by GGP at the Mall directly affects its income, as do any expense adjustments related to those rents. The income from the Mall, in turn, affects the capitalization rate that is used to calculate its value.

¶21 Ultimately, the trial court noted that Miner's "final value" for the Mall based on the income approach was "based on the actual income and expenses provided" when the excessive assessment claim was reviewed by the City. However, the court did not make specific findings regarding the basis for the rents that were considered, other than noting Miner and Kenney's reliance on the CW appraisal, which GGP argues was erroneous in its method for valuing the leases.

---

[3] GGP is a publicly traded real estate investment trust that owns many malls nationwide, and must make quarterly and annual filings with the Securities and Exchange Commission.

¶22     Additionally, the City concedes that the trial court did not address whether the rent imputed to GGP's NOI for the AMC Theatre in the CW appraisal was accurate.  The lease for the theatre is for the land only; AMC owns the building.  However, the CW appraisal assumes the theatre's lease with GGP includes both the land and building.

¶23     Although the trial court clearly found the City's experts to be more credible than GGP's experts, it did not explain *why* they were more credible.  In other words, the court's credibility determinations are unsupported.  Therefore, without more specific findings as to the bases for the rent valuation, we are unable to determine whether the court's factual findings relating to the leases and rents are "against the great weight and clear preponderance of the evidence."  *See id.*, ¶62.

¶24     We find a similar problem with the trial court's factual findings relating to the deduction of capital expenditures.  In particular, GGP spent approximately $70 million on improvements and renovations to the Mall property in the fall of 2014 in preparation for a Nordstrom department store.  Krause—who, like Miner, used the Tier 3 income approach in setting the 2014 and 2015 assessments for the Mall—increased the Mall's assessment for 2015 due to those improvements.[4]

¶25     However, the experts in this case had differing opinions on how these capital expenditures should affect the assessment of the Mall.  For example, Krause did not deduct the cost of the improvements for the Nordstrom expansion, concluding that it was "both an improvement and an enhancement with an expected

---

[4] We note that the improvements to the Mall property did not include the building in which the Nordstrom department store is located; Nordstrom owns the land and building where its store is located, and is assessed separately from the Mall.

return." In contrast, Bakken—one of GGP's experts—made deductions in his appraisal for the Nordstrom expansion improvements for all three years being challenged.

¶26    Bakken's appraisal was reviewed by Hamilton, one of the City's experts. Hamilton opined that the deduction of the Nordstrom expansion costs "does not recognize any potential change in revenue," and that these deductions were "improper." Similarly, Miller, another expert for the City, declared that it is "not appropriate" to deduct such costs without "considering benefits" of those improvements—that is, the expected return on investment for the improvements. Yet, Kenney's independent appraisal of the Mall, prepared for the City, deducted capital expenses.

¶27    Thus, the opinions of the City experts do not appear to be in sync on the issue of the deduction of capital expenses, and it is not clear from the trial court's findings how it reconciled the opinions of the City's experts. For example, there is no indication of whether the "benefits" of the expansion costs were included in Krause's assessment for 2015.

¶28    Additionally, Miller stated that it was improper for Bakken and Marchitelli to deduct the Nordstrom expansion costs as capital expenses in their appraisals for 2013 and 2014 because "no binding agreement had been entered between GGP and Nordstrom." This seems to indicate that a deduction may have been appropriate for 2015; however, the trial court does not specifically address this in its findings.

¶29    In short, it is unclear from the trial court's findings how it determined that the capital expenditures by GGP for the Nordstrom expansion improvements should have been considered; that is, whether they were improperly deducted only

9

in 2013 and 2014, because no binding agreement between GGP and Nordstrom was yet in existence, or whether they should have been deducted at all. Moreover, it is unclear whether there were other capital expenses at issue here besides the Nordstrom expansion costs.

¶30     The presumption of correctness of an assessed value is overcome if the party challenging the assessment presents "significant contrary evidence" that the assessment was incorrect. *Adams Outdoor Advert., Ltd. v. City of Madison*, 2006 WI 104, ¶25, 294 Wis. 2d 441, 717 N.W.2d 803. In this case, there was extensive factual information introduced during the trial, which was noted by the trial court, in addition to its making a number of references to the lack of information provided by GGP. However, the written decision of the trial court jumps from the facts that it notes in its decision to its findings, without explaining how and why it came to make those findings of fact—such as why the City's experts were more credible—leaving us with numerous questions regarding the bases for those findings. Because the court did not provide this reasoning in its decision, we are unable to determine whether the evidence presented by GGP was sufficient to overcome the presumption of correctness for the City's assessments of the Mall. Therefore, we reverse and remand this matter for further fact finding that includes the bases and reasoning upon which the trial court's findings of fact and conclusions of law are based, consistent with this opinion.

*By the Court.*—Judgment reversed and caused remanded with directions.

Not recommended for publication in the official reports.