COURT OF APPEALS
DECISION
DATED AND FILED

October 29, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP974**

STATE OF WISCONSIN

Cir. Ct. Nos. **2016CV208**
**2017CV187**

IN COURT OF APPEALS
DISTRICT IV

---

LOWE'S HOME CENTERS, LLC,

PLAINTIFF-APPELLANT,

V.

VILLAGE OF PLOVER,

DEFENDANT-RESPONDENT.

---

APPEAL from an order of the circuit court for Portage County: THOMAS T. FLUGAUR, Judge. *Affirmed.*

Before Kloppenburg, Graham, and Nashold, JJ.

¶1 NASHOLD, J. Lowe's Home Centers, LLC (Lowe's), challenges as excessive the 2016 and 2017 property tax assessments of its store in the Village of Plover. Following a trial, the circuit court upheld the assessments and dismissed the claims. We affirm.

**BACKGROUND**

¶2      In 2005, Lowe's completed construction of a big box store in a retail area on the Village of Plover's northeast side.  The Village assessed the land and improvements (the subject property) for the 2005 tax year at $7,356,600.  The Village did not modify the assessed value for any of the subsequent 12 years, and Lowe's never challenged the assessments in any year between 2005 and 2015.

¶3      On July 1, 2016, Lowe's filed a complaint, pursuant to WIS. STAT. § 74.37(3)(d), contesting the January 1, 2016 assessment as excessive.[1]  Lowe's filed another complaint one year later challenging the January 1, 2017 assessment. The cases were consolidated.

¶4      A four-day bench trial was held in January 2019.  The circuit court heard testimony from Village Assessor Debra Edwards; Lowe's' expert appraiser Michael MaRous; the Village's expert appraiser Dominic Landretti; and Dr. Thomas Hamilton, retained by the Village to present expert testimony in rebuttal to MaRous's testimony and report.  All three experts also submitted reports that were entered into evidence.  The parties submitted pre-trial and post-trial briefs.

¶5      In April 2019, the circuit court issued a written decision, affirming the Village's assessments and dismissing both complaints.  The court determined that Lowe's had not overcome the presumption of correctness afforded to municipalities' assessments pursuant to WIS. STAT. § 70.49(2).  Specifically, the

_____

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.  We cite the current version for ease of reference.  The statutory language that we apply here has not changed.

court determined that the 2016 and 2017 assessments were the result of mass appraisals and that Lowe's failed to show that the mass appraisals did not comply with Wisconsin law. The court then analyzed the assessments under the three-tier hierarchy provided for in Wisconsin statute and case law, as well as in the 2016 *Wisconsin Property Assessment Manual* (*Property Assessment Manual*).[2] *See* WIS. STAT. § 70.32(1); *State ex rel. Markarian v. City of Cudahy*, 45 Wis. 2d 683, 685-86, 173 N.W.2d 627 (1970); *see also* ***Bonstores Realty One, LLC v. City of Wauwatosa***, 2013 WI App 131, ¶14, 351 Wis. 2d 439, 839 N.W.2d 893.

¶6      Because there was no recent arm's-length sale of the property to enable a Tier I analysis, the circuit court first addressed the parties' analysis of the Tier II comparable sales approach. *See **Markarian***, 45 Wis. 2d at 686. The court determined that there were no reasonably comparable sales to facilitate an analysis under the Tier II approach, rejecting the proposed comparable sales offered by Lowe's' expert, MaRous. The court found that all of MaRous's proposed properties differed from the subject property in that they "were either vacant stores or stores in transition/distressed," whereas the Lowe's store had been in continual operation since its construction in 2005. The court also found that MaRous's proposed comparable properties differed from the subject property in exposure to the market and location.

¶7      The circuit court relied on the Tier III cost approach, crediting the cost approach analysis of the Village's expert, Landretti, over that conducted by Lowe's' expert, MaRous. Using the cost approach, Landretti estimated that the

---

[2] All references are to the 2016 edition of the *Wisconsin Property Assessment Manual* unless otherwise noted.

subject property's market value for 2016 was $8,500,000, after rounding from his calculations of $8,539,000. He arrived at this amount by estimating the cost of a replacement building to be $8,216,000, making a $2,347,000 deduction for depreciation based on the building's age and economic life—an approximately 29% deduction that included depreciation due to functional obsolescence—and then adding $370,000 for the depreciated value of site improvements and $2,300,000 for the value of the land. Using the same approach, Landretti estimated a market value of $8,700,000 for 2017. Landretti's report explained that his "economic age-life" depreciation method accounted for "physical deterioration, functional obsolescence, and external obsolescence."

¶8    The circuit court noted that MaRous's analysis under the Tier III cost approach most deviated from Landretti's in its inclusion of a 50% deduction for functional obsolescence of the building. Under MaRous's cost approach, which included the 50% deduction for functional obsolescence, MaRous estimated the market value of the subject property to be $4,620,000 for 2016, after rounding from his calculations of $4,616,340. MaRous arrived at this amount by estimating the cost of a replacement building to be $7,865,361, making a total 75% deduction for physical, functional, and external depreciation, and then adding $650,000 for the depreciated value of site improvements and $2,000,000 for the value of the land. Using this same approach, MaRous estimated a value of $4,500,000 for 2017. The court determined that MaRous's functional-obsolescence deduction was unfounded, as MaRous had determined the highest and best use of the subject property was continued use as a big box retailer,[3] yet he made a substantial

_____

[3] MaRous specifically concluded that the highest and best use for the subject property was continued use as an operating Lowe's. Landretti likewise concluded that the highest and best use was its existing use as a big box retail store.

functional-obsolescence deduction because the property was single-tenant instead of multi-tenant. The court found that Landretti's estimate under the Tier III cost approach was the "most credible," and "provide[d] the best estimate of the fee simple value of the property," "the fairest value of the property," and the "least amount of speculation."

¶9  The court affirmed the Village's assessments, and dismissed both of Lowe's' claims. Lowe's appeals.

¶10  In addition to the parties' briefs, amicus briefs were filed by the League of Wisconsin Municipalities and Wisconsin Manufacturers & Commerce.

## DISCUSSION

¶11  This is a review of the circuit court's decision rejecting Lowe's' claims of excessive tax assessments under WIS. STAT. § 74.37. "The question on appeal in a Wis. Stat. § 74.37 action is not whether the initial assessment was incorrect, but whether it was excessive." *Metropolitan Assocs. v. City of Milwaukee*, 2018 WI 4, ¶40, 379 Wis. 2d 141, 905 N.W.2d 784.

¶12  Pursuant to WIS. STAT. § 70.32(1), "[r]eal property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual." A municipality's assessment is presumed correct upon entry of the assessed value into the assessment roll and submission of the assessor's affidavit:

> The value of all real and personal property entered into the assessment roll to which such affidavit is attached by the assessor shall, in all actions and proceedings involving such values, be presumptive evidence that all such properties have been justly and equitably assessed in proper relationship to each other.

WIS. STAT. § 70.49(2). Here, it is undisputed that the subject property was assessed at $7,356,600 in the challenged tax years. Thus, the assessments are "entitled to a presumption that [they were] 'justly and equitably' made, giving rise to a presumption of correctness." *Metropolitan Assocs.*, 379 Wis. 2d 141, ¶50; *see also Bonstores*, 351 Wis. 2d 439, ¶10 ("Because both parties agreed that the property was assessed at $25,593,300, the City has met its burden of establishing the presumptive fair market value of the property.").

¶13 "The presumption can be overcome if the challenging party presents significant contrary evidence," *Metropolitan Associates*, 379 Wis. 2d 141, ¶50, or shows that the assessment does not comply with Wisconsin law or the *Property Assessment Manual*, *see Regency West Apartments LLC v. City of Racine*, 2016 WI 99, ¶¶3-4, 22, 71, 73, 372 Wis. 2d 282, 888 N.W.2d 611; *see also Bonstores*, 351 Wis. 2d 439, ¶5.[4]

¶14 "Whether a city has erroneously failed to follow statutory requirements in making an assessment is a question of law that we review de novo." *Walgreen Co. v. City of Madison*, 2008 WI 80, ¶17, 311 Wis. 2d 158,

---

[4] We acknowledge that our appellate courts have also expressed the rule regarding when the presumption attaches in a slightly different way—for example, that "'[n]o presumption of correctness may be accorded to an assessment that does not apply the principles in the *Property Assessment Manual*.'" *Walgreen Co. v. City of Madison*, 2008 WI 80, ¶17, 311 Wis. 2d 158, 752 N.W.2d 687 (quoted source omitted). The precise language on this point may be of little practical consequence but, consistent with WIS. STAT. § 70.49(2) and other precedent from our appellate courts, we employ the language indicating that the presumption exists upon the assessment being entered into the assessment roll, and that the taxpayer may overcome the presumption by showing significant contrary evidence or that the assessment does not comply with Wisconsin law or the *Wisconsin Property Assessment Manual*. *See, e.g., Metropolitan Assocs. v. City of Milwaukee*, 2018 WI 4, ¶50, 379 Wis. 2d 141, 905 N.W.2d 784; *Regency West Apartments LLC v. City of Racine*, 2016 WI 99, ¶¶3-4, 22, 71, 73, 372 Wis. 2d 282, 888 N.W.2d 611; *Bonstores Realty One, LLC v. City of Wauwatosa*, 2013 WI App 131, ¶¶5, 10, 351 Wis. 2d 439, 839 N.W.2d 893.

752 N.W.2d 687; *see also* **Bonstores**, 351 Wis. 2d 439, ¶6 ("[W]e independently review whether a valuation complied with the statutes and the Wisconsin Property Assessment Manual."). However, "we defer to the circuit court's findings of fact when resolving conflicting evidence. We will not upset the court's factual findings, including findings involving the credibility of witnesses, unless they are clearly erroneous." **Bonstores**, 351 Wis. 2d 439, ¶6 (citation omitted); *see* WIS. STAT. § 805.17(2). "In particular, it is within the province of the factfinder to determine the weight and credibility of expert witnesses' opinions." **Bonstores**, 351 Wis. 2d 439, ¶6.

¶15 On appeal, Lowe's argues that the Village is not entitled to the presumption of correctness for several reasons. First, Lowe's argues that the 2016 and 2017 assessments were arrived at contrary to Wisconsin law and the *Property Assessment Manual* because the assessed value for the subject property remained unchanged between 2005 and 2017 and the Village failed to comply with the procedures for a mass appraisal. Second, Lowe's contends that the circuit court improperly rejected Lowe's' suggested comparable sales. Finally, Lowe's argues that the court's analysis of the Tier III cost approach was flawed because, among other things, the court did not take into account the functional and economic obsolescence identified by Lowe's' expert, MaRous.

¶16 For the reasons explained below, we agree with the circuit court that Lowe's has failed to overcome the presumption of correctness, and we affirm the court's decision upholding the assessments and dismissing Lowe's' claims.

*I. Mass Appraisal*

¶17    Lowe's argues that the Village is not entitled to the presumption of correctness because the Village's 2016 and 2017 assessments violated the *Property Assessment Manual* by carrying over the exact market value from the 2005 appraisal for 12 years.  Lowe's relies on the *Property Assessment Manual*'s statements that "[a]ssessments should not be carried over from year to year with no adjustments" but should instead reflect various trends and factors that affect market value.  *Wisconsin Property Assessment Manual*, at 19-19.  Lowe's argues that, contrary to the circuit court's conclusion, there was no mass appraisal underlying the 2016 and 2017 assessments.  Lowe's' arguments are not persuasive.

¶18    Our supreme court approved of the use of mass appraisal in **Metropolitan Associates**, noting that the practice is "widely used throughout the country."  **Metropolitan Assocs.**, 379 Wis. 2d 141, ¶44.  "Mass appraisal is the systematic appraisal of groups of properties, as of a given date, using standardized procedures and statistical testing."  *Wisconsin Property Assessment Manual*, at 7-39; *see also* **Metropolitan Assocs.**, 379 Wis. 2d 141, ¶29 (using same definition from 2009 *Property Assessment Manual*).

¶19    The *Property Assessment Manual* explains that "[t]he purpose of mass appraisal is the equitable and efficient appraisal of all property, in a jurisdiction, for ad valorem tax purposes.  Mass appraisal is the underlying principle that Wisconsin assessors should be using to value properties in their respective jurisdictions."  *Wisconsin Property Assessment Manual*, at 7-39-7-40.  The *Property Assessment Manual* further explains that "[a] mass appraisal system is comprised of four interdependent subsystems":  (1) a "[d]ata management

system," (2) a "[s]ales analysis system," (3) a "[v]aluation system," and (4) an "[a]dministrative system." *Id.*, at 7-40.

¶20　The circuit court determined that valid mass appraisals occurred in 2016 and 2017.　Specifically, the court found that "[t]he Village Assessor, Deb Edwards, testified that mass appraisal was performed for the January 1, 2016 and January 1, 2017 years of value.　The mass appraisal included a sales ratio analysis through use of a computer-assisted mass appraisal program that identified properties that needed adjustment from the prior year."　The court continued:

> A review of the evidence shows that the Village contracted with Dan McHugh, Jr. of Affiliated Property Valuation Services, LLC. to perform commercial assessments in 2016 and 2017.　WIS. STAT. § 70.055 specifically allows municipalities to retain expert assessment help.
>
> Lowe's failed to demonstrate that the mass appraisal performed by the Village for the January 1, 2016 and January 1, 2017 years did not comply with Wisconsin law.

As we explain, the record supports the circuit court's determination that valid mass appraisals occurred.

¶21　Edwards testified that the Village did not simply carry over the assessed value without analysis but instead performed a mass appraisal each year from 2006 through 2017 and that the evaluation resulted in no change to the assessments.　Edwards further testified that Dan McHugh, of Affiliated Property Valuation Services, was responsible for creating the computer-assisted mass appraisal models for the Village's commercial properties, which identified properties needing adjustment.　Despite McHugh's role in the mass appraisals, Lowe's did not call McHugh as a witness and instead questioned only Edwards on the mass appraisals, including with respect to the four "subsystems" of mass

9

appraisal. Edwards testified regarding the subject property's record card, which contains data about the property. She also testified to the Village's use of a sales ratio study, which, according to the *Property Assessment Manual*, is "the primary product" of a sales analysis system and "generally provide[s] the best available measures of appraisal performance." *Wisconsin Property Assessment Manual*, at 7-41. The sales ratio analysis was conducted through use of a computer-assisted mass appraisal program that identified properties that needed adjustments from the prior year. Edwards agreed that a valuation system includes a "cost approach" and testified that, although she did not personally perform a cost approach analysis for the mass appraisals for 2016 and 2017, McHugh may have. Edwards also testified to having produced annual assessor's reports. Edwards' testimony provides a basis for the circuit court to determine that valid mass appraisals occurred.

¶22    Lowe's contends that the Village relied on Annual Assessment Reports (AARs) to prove the execution and propriety of mass appraisals for the 2016 and 2017 assessments. Lowe's states that "[t]he 2016 and 2017 Village AARs were presented at trial as if they constituted the 'mass appraisal' pertaining to 2016 and 2017 assessments of the subject property." Lowe's asserts that the AARs do not suffice as evidence of mass appraisal.

¶23    Lowe's relies in substantial part on the Village's discovery response, which referred Lowe's to the AARs "for more information on the mass appraisal performed in years 2016 and 2017." However, this response does not convey that the AARs constituted the mass appraisal. Moreover, the circuit court did not mention the AARs as a basis for its determination that a valid mass appraisal occurred, nor does the Village argue on appeal that the AARs constitute the mass appraisals at issue. Lowe's fails to show that the AARs constituted the Village's mass appraisals.

¶24 Lowe's also argues that the Village's mass appraisals did not include a valuation system as required by the *Property Assessment Manual* because none of the properties included in its commercial sales ratio analysis were reasonably comparable to the subject property. Lowe's relies on the *Property Assessment Manual*'s statement that a valuation system consists of "mass appraisal applications of the sales comparison, cost, and income approaches to value." *Wisconsin Property Assessment Manual*, at 7-41. Lowe's further relies on the *Property Assessment Manual*'s statement that "[a] good mass appraisal system uses market data to build models that replicate the market in order to value all properties in the jurisdiction at market, for ad valorem tax purposes." *Id.*, at 7-42.

¶25 To the extent Lowe's is challenging the Village's determination that there were no reasonably comparable properties, we will address that argument below as part of a Tier II analysis. Any other argument Lowe's intends to make with regard to comparable sales and mass appraisals is undeveloped. Lowe's does not explain or apply the *Property Assessment Manual*'s phrase, "*mass appraisal applications* of the sales comparison, cost, and income approaches to value" (emphasis added), nor does Lowe's describe how the Village's mass appraisals failed to comply with this requirement. Lowe's likewise fails to explain how the Village's mass appraisals failed to "use[] market data to build models that replicate the market in order to value all properties in the jurisdiction at market," as the *Property Assessment Manual* suggests is necessary for a good mass appraisal. We do not address Lowe's' unsupported and undeveloped arguments.

*See* ***State v. Pettit***, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (arguments that are unsupported or undeveloped need not be considered).[5]

¶26   Moreover, in criticizing Edwards' testimony, Lowe's ignores the role played by McHugh, the consultant the Village hired to assist with its commercial assessments, including the 2016 and 2017 assessments. At trial, Edwards testified that McHugh's company was responsible for creating the models used by the Village for mass appraisal.

¶27   Significantly, Lowe's did not call McHugh as a witness, despite the fact that the Village's interrogatory responses mention McHugh multiple times and make clear that he was involved in assisting the Village in its appraisals of the subject property. For instance, in its responses, the Village acknowledged contracting with McHugh for commercial appraisals since 2009. The Village also stated in its responses that McHugh was a person who prepared or assisted with preparing the assessments of the subject property as of both January 1, 2016, and January 1, 2017. The discovery responses were produced on April 19, 2017, and on July 3, 2018, giving Lowe's ample notice of McHugh's involvement prior to the January 2019 trial. Furthermore, the Village's contract with McHugh's

---

[5] In support of its mass appraisal argument, Lowe's makes assertions that are unsupported by the record, such as that Edwards "admitted" that the assessments were not "performed in accordance with Wisconsin law," and that Edwards "repeatedly admitted" that the sales ratio analyses "were irrelevant to the valuation of the subject property." Also, in an apparent attempt to convince this court that the Village essentially made up its response that mass appraisals occurred, Lowe's spends multiple pages comparing the Village's initial response to discovery to the Village's amended response. This same suggestion was made before the circuit court, which rejected the premise, instead crediting Edwards' testimony that the assessments were based on valid mass appraisals. Lowe's has not shown that the circuit court's determination was in error.

company, Affiliated Property Valuation Services, LLC, was provided to Lowe's in discovery.

¶28 Lowe's concedes that Wisconsin municipalities may retain outside help to assist with assessments. *See* WIS. STAT. § 70.055. Thus, there was nothing improper about the Village having hired McHugh. The Village was under no obligation to call McHugh to testify, as it was Lowe's that had the burden to overcome the presumption of correctness. *See* WIS. STAT. § 70.49(2). Lowe's disputes the propriety of the underlying practices that led to the 2016 and 2017 assessments, but, by declining to call McHugh as a witness, Lowe's chose to forgo the opportunity to call his work into question at trial. On appeal, Lowe's makes no argument that it was prevented from calling McHugh. Lowe's knew as early as April 2017 that McHugh had information related to the assessments, as the Village's discovery responses identified him as someone who assisted the assessor. Instead of calling McHugh, Lowe's relied solely on Edwards' testimony in an effort to show the nonexistence or flawed execution of a mass appraisal. However, Edwards testified that the 2016 and 2017 assessments were based on mass appraisals, and Lowe's did not present sufficient evidence to convince the court otherwise. We do not disturb the circuit court's factual findings, including findings involving the credibility and weight of witness testimony, unless they are clearly erroneous. *See **Bonstores***, 351 Wis. 2d 439, ¶6.

¶29 Based on the foregoing, Lowe's has failed to show that a mass appraisal did not occur or that the procedures employed to conduct the mass appraisals were contrary to Wisconsin law or the principles in the *Property Assessment Manual*.

*II. Three-Tier Analysis*

¶30    Lowe's argues that the circuit court misapplied the three-tier hierarchy set forth in *Markarian*, 45 Wis. 2d at 685-86.

¶31    WISCONSIN STAT. § 70.32(1) provides a rubric for the three methods by which assessors may determine the value of real property.  Our appellate courts have explained that these methods constitute a three-tier hierarchy:

> "Evidence of an arm[']s-length sale of the subject property is the best evidence of true cash value.  [Tier 1]  If there has been no recent sale of the subject property, an assessor must consider sales of reasonably comparable properties.  [Tier 2]  Only if there has been no arm[']s-length sale and there are no reasonably comparable sales may an assessor use any of the third-tier assessment methodologies.  [Tier 3]"

*Allright Props., Inc. v. City of Milwaukee*, 2009 WI App 46, ¶11, 317 Wis. 2d 228, 767 N.W.2d 567 (quoting *Adams Outdoor Advert., Ltd. v. City of Madison*, 2006 WI 104, ¶34, 294 Wis. 2d 441, 717 N.W.2d 803).  The third tier is comprised of "'all the factors collectively which have a bearing on value of the property in order to determine its fair market value.'" *Adams Outdoor Advert.*, 294 Wis. 2d 441, ¶35 (quoting *Markarian*, 45 Wis. 2d at 686).  "These factors include 'cost, depreciation, replacement value, income, industrial conditions, location and occupancy, sales of like property, book value, amount of insurance carried, value asserted in a prospectus and appraisals produced by the owner.'" *Id.* (quoting *State ex rel. Mitchell Aero, Inc. v. Board of Rev. of City of Milwaukee*, 74 Wis. 2d 268, 278, 246 N.W.2d 521 (1976)).

¶32    It is undisputed in this case that the subject property had not been sold in the approximately 15 years since its construction so as to enable a Tier I analysis.  Thus, the circuit court first addressed the second tier.

14

*A. Tier II Analysis*

¶33   The Tier II sales comparison approach "relies on recent market sales of similar properties to predict the probable market price of the subject." *Wisconsin Property Assessment Manual*, at 7-22.   According to the *Property Assessment Manual*, "[c]omparable sales refer to properties that are similar to the subject property in age, condition, use, type of construction, location, design, physical features, and economic characteristics." *Id.*, at 7-24.

¶34   Lowe's' expert, MaRous, based his Tier II sales comparison approach on the sale of eight properties that he concluded were reasonably comparable to the subject property.  Based on this analysis, MaRous determined the value of the subject property to be $4,550,000 for the 2016 and 2017 assessment periods, as compared to the Village's assessed value of $7,356,600.  However, the circuit court agreed with the Village's expert, Landretti, that the eight properties were not reasonably comparable and that there were no reasonably comparable properties under the Tier II sales comparison approach.

¶35   In concluding that the properties were not reasonably comparable, the circuit court found that the properties upon which MaRous relied "were either vacant stores or stores in transition/distressed," whereas Lowe's had been continually operating since its construction in 2005, with no indication that it would become vacant prior to the dates of value.  There is no dispute that all of MaRous's proposed properties were vacant.  The court also found that MaRous failed to analyze "how the vacancies impacted the marketability of the properties." The court further found:  "MaRous never explained in his report or in court what a normal vacancy time period is for the Plover commercial real estate marketplace.  Nevertheless, he used comparable sales that were vacant for extended periods of

time; in one case, a former Target store was vacant for four years prior to the date of the sale ...." In contrast, when summarizing Landretti's Tier II analysis, the court found:

> [Landretti] described in his report that he located numerous sales of big box retail properties; however, the sales included properties that were vacant, distressed, purchased for redevelopment, or leased. Based on the [*Property Assessment Manual*'s] direction that when valuing stabilized, operating retail properties, the assessor should choose comparable sales exhibiting a similar highest and best use and similar placement in the retail marketplace, Landretti concluded that the sales were not reasonably comparable.

¶36 The circuit court also rejected MaRous's analysis because MaRous failed to explain how the sales prices of his proposed comparables were affected by variations in market exposure time, a consideration that MaRous himself indicated may influence a property's eventual selling price. The court noted the very short exposure times associated with the sales of three of MaRous's eight proposed comparable sales. These sales were former American TV stores that sold to Steinhafel's after an exposure time of approximately two months, following American TV going into receivership. The court considered MaRous's testimony that, if a property is exposed to the market for a shorter time (i.e., less than two to three years), it should sell for less than if the property had been fully exposed to the market. Nevertheless, the court observed, MaRous's report "excludes information about the short exposure time" for the three American TV stores. The court also concluded that a shorter exposure time is a sign that the property is not reasonably comparable and may be evidence of a distressed sale.

¶37 Finally, the circuit court took into account the locations of the properties, noting that "[a]ll the experts agree that location is a primary factor when assessing any real estate." The court summarized the issue in the case as

whether, when assessing fair market value, "a home improvement retail building, Lowe's, which is located in a thriving low vacancy retail setting, compares with vacant or transition properties located in other areas of the state." The court agreed with Landretti in rejecting MaRous's comparable sales based on location.

¶38 We now address Lowe's' arguments that the circuit court erred in rejecting MaRous's comparables based on vacancy status and exposure time, as well as the court's consideration of location, its alleged failure to consider two of MaRous's comparables, and its purported consideration of the property's use as a home improvement store versus a big box store.

*1. Vacancy status*

¶39 Lowe's' primary argument is that the circuit court acted contrary to Wisconsin law and the *Property Assessment Manual* by considering vacancy status when it rejected MaRous's proposed comparable sales. However, Lowe's' argument is expressly refuted by the *Property Assessment Manual* and by this court's precedent.

¶40 As the circuit court noted, the *Property Assessment Manual* instructs as follows:

> The assessor should avoid using sales of improved properties that are vacant ("dark") or distressed as comparable sales unless the subject property is similarly dark or distressed. A vacant store is considered dark when it is vacant beyond the normal time period for that commercial real estate marketplace and can vary from one municipality to another.

*Wisconsin Property Assessment Manual*, at 9-12.[6]  The circuit court concluded that MaRous did not follow this directive.  This provision from the *Property Assessment Manual*, which Lowe's' brief-in-chief ignores, undercuts Lowe's' argument that the court erred by rejecting proposed sales because the properties were vacant at the time of sale.

¶41    This passage from the *Property Assessment Manual* references our decision in **Bonstores**, in which we upheld a circuit court's determination that an expert's opinion was unreliable because the opinion disregarded differences in the vacancy statuses of the proposed comparable properties.  *See **Bonstores***, 351 Wis. 2d 439, ¶¶20-22.  We noted the circuit court's finding that the comparable sales identified by the taxpayer's expert "'were all distressed in one way or another,'" and that a majority had gone "'dark,'" which was defined as "'a period of time where the store is not operating.'"  *Id.*, ¶21.  We concluded:

> [The taxpayer's expert] agreed that the subject property is not a "dark" store, has never gone dark, and there is no evidence it would go dark and be sold off as a single property.  As such, the circuit court did not erroneously determine that [the taxpayer's expert's] reliance on the sales of properties he deemed comparable was unreliable.

*Id.*, ¶22.  **Bonstores** is consistent with the *Property Assessment Manual*'s directive to consider vacancy status in determining whether sales are comparable for purposes of a Tier II analysis.  And, as in **Bonstores**, the subject property here "is

---

[6] Similar language is used at other points in the *Property Assessment Manual*.  *See Wisconsin Property Assessment Manual*, at 9-43 ("Regardless of the approach used, the assessor should be careful to avoid using comparable sales involving properties that are vacant, in transition or suffering from some form of distress unless the subject property is similarly vacant, in transition, or distressed.").

not a 'dark' store, has never gone dark, and there is no evidence it would go dark." *See id.*

¶42 Lowe's asserts that none of MaRous's proposed comparable sales were "distress sales" like those at issue in **Bonstores**, because the properties did not involve sellers acting under "undue duress." However, Lowe's does not provide any authority indicating that Wisconsin has adopted the "undue duress" definition of a distress sale that Lowe's advances. Moreover, in **Bonstores** we observed that the circuit court had "used the phrase 'distressed property' to refer to a 'dark' business," *id.*, and that "dark" referred to "'a period of time where the store is not operating,'" *id.*, ¶21. Finally, as shown above, the *Property Assessment Manual* uses "vacant" and "dark" synonymously.

¶43 Regardless of whether any or all of MaRous's proposed comparable sales were distress sales, Lowe's' argument fails because it is contrary to the *Property Assessment Manual*'s explicit directive that the assessor "should avoid using sales of improved properties that are vacant ('dark') *or* distressed as comparable sales unless the subject property is similarly dark or distressed." *Wisconsin Property Assessment Manual*, at 9-12 (emphasis added). Thus, whether distressed or vacant, such attributes are properly considered in determining if properties are reasonably comparable to the subject property.

¶44 Despite the *Property Assessment Manual*'s clear directive, Lowe's also argues that the circuit court's consideration of vacancy status is prohibited by **Walgreen Co. v. City of Oshkosh**, No. 2013AP2818, unpublished slip op. (WI

19

App Dec. 17, 2014). We disagree. Even as persuasive authority,[7] *Walgreen/Oshkosh* is distinguishable and does not prohibit consideration of vacancy status for purposes of evaluating proposed comparable properties under a Tier II analysis.

¶45     In *Walgreen/Oshkosh*, the two stores at issue were built to Walgreen's specifications, but Walgreen was a lessee, not an owner-occupier. *See id.*, ¶3. In examining the assessment, we determined that Oshkosh's assessments of the subject properties impermissibly incorporated the value of the ongoing business concern at the properties, as "the evidence presented at trial showed that the City's assessments relied on above-market sale prices and contract rents." *Id.*, ¶14. In contrast, in this case there is no indication that the Village or the circuit court considered Lowe's' ongoing business concern. Also, *Walgreen/Oshkosh* in no way negates the *Property Assessment Manual*'s directive to consider vacancy status in determining whether a property is reasonably comparable under a Tier II analysis.

## 2. *Exposure times*

¶46     Lowe's also challenges the circuit court's findings with respect to exposure times, arguing that there was no evidence that exposure time disqualified any of MaRous's sales. Lowe's acknowledges MaRous's testimony that a short exposure time could impact the sales price, but asserts that, according to MaRous, his proposed properties "were in desirable locations, were marketed by a seller

---

[7] *See* WIS. STAT. RULE 809.23(3)(a) and (b) (generally, an "unpublished opinion may not be cited in any court of this state as precedent or authority," but an "unpublished opinion issued on or after July 1, 2009, that is authored by a member of a three-judge panel or by a single judge under s. 752.31(2) may be cited for its persuasive value").

without distress, and sold at full market value." Although Lowe's states that MaRous's testimony was "unrebutted" on these points, a review of the four-day trial belies that assertion. After hearing this evidence, the circuit court found Landretti's opinion more credible than MaRous's—in part because of MaRous's omission of his proposed properties' exposure times from his report—and Lowe's has not shown that the court erroneously exercised its discretion in weighing the credibility of the parties' experts.

*3. Location*

¶47     Lowe's also takes issue with the circuit court's consideration of the locations of Lowe's' proposed properties. As stated, the court summarized the issue in the case as whether, when assessing fair market value, "a home improvement retail building, Lowe's, which is located in a thriving low vacancy retail setting, compares with vacant or transition properties located in other areas of the state." Lowe's relies on the *Property Assessment Manual*'s instruction that sales from outside of the municipality should be utilized and adjustments made for location. *Wisconsin Property Assessment Manual*, at 7-25. Lowe's states that MaRous made "locational adjustments" to the properties he deemed to be in a superior location and concluded that the locational attributes of his other four properties were sufficiently comparable to the subject property so as to not require an adjustment.

¶48     Lowe's cites **State ex rel. Brighton Square Co. v. City of Madison**, 178 Wis. 2d 577, 588, 504 N.W.2d 436 (Ct. App. 1993), in which we approved of adjustments to properties that enable comparison to the subject property. However, as the Village notes, **Brighton Square** does not require that courts find properties to be reasonably comparable whenever a taxpayer's expert makes

21

adjustments based on location or other attributes. Moreover, as the *Property Assessment Manual* notes: "The location for a retail store is of extreme importance. National firms do extensive market studies to determine the exact location of their retail outlets. Even the side of the street on which the property is located can have an effect on value." *Wisconsin Property Assessment Manual*, at 9-43. Given this specificity, Lowe's has not demonstrated that the circuit court's consideration of location was erroneous.

*4. MaRous's second and seventh properties*

¶49    Lowe's challenges the circuit court's analysis under Tier II because the court did not refer to MaRous's second and seventh properties, two former K-Mart stores built in 1967 and 1989, respectively. Lowe's argues that this shows a failure of the circuit court to "properly conclude that *no* reasonably comparable sales exist" before relying on a Tier III analysis.

¶50    However, contrary to Lowe's' assertion, the circuit court did in fact evaluate all of MaRous's proposed comparable sales and concluded that no reasonably comparable sales exist. As stated in the court's decision: "The Court looked at the eight comparables studied by MaRous (Exhibit 24, pp 24-38) to determine whether it is an apples-to-apples comparison with the subject Lowe's property." After hearing all of the evidence presented at the four-day trial, and following briefing from the parties, the court "agree[d] with the Village's position that there are no comparables to the subject property." Citing the *Property Assessment Manual* and mirroring its language, the court therefore concluded that, "since there are no comparables from sales for this larger retail venue, the assessor should use the Cost and/or Income Approach" to determine the fair market value. *See Wisconsin Property Assessment Manual*, at 9-43 ("For larger retail venues and

22

those smaller stores for which there are no comparable sales, the assessor should use the income and/or cost approaches.").[8]

¶51    Furthermore, Lowe's points to no authority requiring that the circuit court specifically explain its conclusion separately for each purported comparable sale offered by the taxpayer. Nor does Lowe's provide any analysis to explain why these two properties were comparable, except by generally recounting MaRous's testimony. Lowe's' reliance on **Hanning Regency LLC v. Town of Brookfield Board of Review**, No. 2018AP1584, unpublished slip op. (WI App July 3, 2019), is likewise unavailing because **Hanning** stands only for the well-established proposition that a court may not move to a Tier III analysis if Tier I or Tier II information is available. Here, the circuit court clearly followed the law in proceeding to a Tier III analysis only after determining that there were no reasonably comparable sales and no arm's-length sale involving the subject property.

*5. Home improvement store versus big box store*

¶52    Lowe's highlights comments by the circuit court to the effect that the subject property's "highest and best use would be to another *home improvement store* desiring to be a main anchor in a thriving retail environment." Lowe's objects to the specificity of the court's finding of highest and best use, asserting that the parties' experts agreed that the highest and best use of the subject property

---

[8] Lowe's asserts that this "ambiguous commentary" in the *Property Assessment Manual* cannot supplant the *Markarian* hierarchy's mandate that Tier II comparable sales must be used if any reasonable comparable sales exist. Lowe's fails to supports its assertion that the language is either ambiguous or that the circuit court used it to supplant the *Markarian* hierarchy. As stated, the court specifically found that no comparable sales exist.

was the more general category of big box retail. However, we note that, although MaRous and Landretti sometimes expressed the highest and best use in more general terms of "big box retail," MaRous himself stated in his report and testimony that the subject property's highest and best use was its continued use as an operating Lowe's, and Landretti stated that the property's highest and best use was its "continuing" or "existing" use. In addition, Lowe's fails to explain how the court's statement affected its decision.

¶53     In sum, Lowe's has failed to show that the circuit court erroneously determined that there were no reasonably comparable properties under the Tier II approach, based on its crediting Landretti's opinion over MaRous's for the reasons it stated.

*B.  Tier III Cost Approach*

¶54     The *Property Assessment Manual* explains the basic contours of the Tier III cost approach:  "The cost approach relies on determining either the reproduction or replacement cost of the improvements, subtracting all depreciation, then adding the value of the land." *Wisconsin Property Assessment Manual*, at 7-23.   The *Property Assessment Manual* lists three types of depreciation: "physical, functional, and economic." *Id.*, at 7-31. "Functional obsolescence is the loss in value, due to a lack of or excessive utility. Functional obsolescence occurs over time because of changing needs, technology, design, promotion/marketing, and cost/construction." *Wisconsin Property Assessment Manual*, at 7-32.

¶55     The circuit court determined that the Tier III cost approach was the best measure of the subject property's market value and credited Landretti's cost approach analysis over that provided by MaRous. The court concluded:

The Court finds that the Village's expert Landretti provided the most credible Cost Approach opinion. It was based on market evidence of demand for big box stores in the Plover area, as well as a highest and best use analysis. It provides the best estimate of the fee simple value of the property on the dates of value and is supported by Landretti's other Tier 3 analysis [i.e., Landretti's income approach].

¶56 Under the cost approach, MaRous indicated a value for the subject property of $4,620,000 as of January 1, 2016, and $4,500,000 as of January 1, 2017. Landretti's cost approach indicated a value of $8,500,000 for 2016 and $8,700,000 for 2017. The circuit court found that, without MaRous's deductions for functional and external obsolescence, Landretti's and MaRous's calculations under the cost approach "did not differ greatly." The significant difference in the two experts' opinions of value under the cost approach is that MaRous included a 50% deduction for functional obsolescence. The court's decision identifies this 50% deduction as a primary reason for rejecting MaRous's analysis under the cost approach.

¶57 The circuit court agreed with the Village that the 50% deduction for functional obsolescence was "flawed." Specifically, the court noted that, although MaRous agreed that the highest and best use of the subject property was as a big box retail store, MaRous's calculation that the building was 50% functionally obsolete was based on attributes of the building that differed from attributes of multi-tenant buildings. As the court explained, MaRous had "estimated the cost to build a big box store, but then improperly depreciated it because it was not a multi-tenant improvement that would cost twice as much to build."

¶58 Lowe's argues that the circuit court misapplied the cost approach in several respects. We address each in turn. First, Lowe's argues that the court erred because, according to Lowe's, the court concluded that MaRous should have

25

started with the cost to construct a multi-tenant building. Lowe's contends that it would be inappropriate to start with the cost to construct a multi-tenant building because both experts agreed that the highest and best use was continued use as a big box retail property. In so arguing, Lowe's misapprehends the court's reasoning. Contrary to Lowe's' assertion, the court did not reject MaRous's cost approach on grounds that MaRous should have started with the cost to construct a multi-tenant building. Rather, the flaw that the court identified was that MaRous started with the cost to build a large single-tenant big box retail building but then substantially deducted value from the property because it was not functional as a multi-tenant building. In other words, as the Village aptly states, MaRous "switche[d] highest and best uses midstream." Lowe's has failed to establish that the circuit court erred in finding MaRous's opinion less credible than Landretti's based on this flaw.

¶59 Second, Lowe's argues that MaRous properly used the "reproduction cost" method. However, Lowe's fails to explain how this is at all relevant to the flaw in MaRous's functional-obsolescence calculation, which was the primary reason for the circuit court's rejection of MaRous's analysis, nor does Lowe's otherwise indicate how MaRous's purported application of the reproduction cost method caused the court to err.[9] We are not persuaded that the type of cost estimate used by MaRous was material to the court's rejection of MaRous's opinions.

---

[9] The Village argues that MaRous did not in fact apply the reproduction cost method but instead used the replacement cost method. We need not decide this issue.

¶60    Third, Lowe's argues that the circuit court was influenced by Hamilton's rebuttal testimony regarding "first generation" concepts, the substance of which Lowe's alleges was contrary to Wisconsin law. In characterizing Hamilton's testimony and report, the court stated that Hamilton "found that Lowe's expert, Michael MaRous (MaRous), used *unoccupied*, second generation properties as comparables, and opined that the appropriate comparables would be a first generation *occupied* property." Lowe's argues that the "first generation" concept is contrary to Wisconsin law in that it suggests "that the property should be viewed in light of Lowe's business occupancy."[10] Lowe's' argument is not persuasive for at least two reasons. First, Lowe's has failed to show that the court relied in any way on Hamilton's "first generation" theory, including in rejecting MaRous's cost approach. It is clear from the circuit court's decision that the court's credibility determination rested on the flawed treatment of functional obsolescence in MaRous's testimony and report, rather than on a "first generation" or "second generation" concept.

¶61    Moreover, the law on which Lowe's relies is inapplicable here. Lowe's argues that the circuit court's Tier III analysis ran afoul of *State ex rel. Northwestern Mutual Life Insurance Co. v. Weiher*, 177 Wis. 445, 188 N.W. 598 (1922). Citing *Northwestern Mutual*, Lowe's argues that the subject property cannot be valued based on the particular use of the current owner or occupant, and the current owner should not be viewed as a purchaser.

---

[10] Lowe's does not cite the record or any authority for a definition of "first generation" and "second generation" properties. In its brief-in-chief, Lowe's describes "second generation" retail properties as "properties which were sold by the retailer[s] for whom the propert[ies] [were] originally constructed." Thus, using Lowe's definition, "first generation" properties would presumably be those properties built for the retailers for whom the properties were constructed.

¶62   *Northwestern Mutual* in no way undermines the circuit court's conclusion here.   In that case, our supreme court affirmed the circuit court's reduction of the city's assessment by half because the city based its assessment on the "intrinsic worth" of the "fine, substantial, artistic building, gracing half a block in the city of Milwaukee, built to meet the peculiar needs of its owner, and not well adapted for other uses."   *Id.* at 449-50.   The court concluded that "[t]he statutory rule of assessment of real estate is to assess it at its sale value and not at its intrinsic value if that differs from the sale value."   *Id.* at 448.   The court further stated:   "The argument that the owner may be considered as standing in the place of a purchaser who, if desiring to buy, would pay its reasonable intrinsic worth, forgets the statutory test, namely, What will it bring if the owner is the seller and somebody else is the buyer?"   *Id.*   Unlike in *Northwestern Mutual*, the record in the instant case does not show that the subject property's assessments were based on the property's "intrinsic worth" or unique features valuable only to Lowe's.   Nor does the record show that the circuit court relied on such principles in rejecting MaRous's cost approach or his proposed comparable sales.   Thus, Lowe's' comparison of the circuit court's decision to *Northwestern Mutual* is unavailing.[11]

---

[11] Lowe's also cites *State ex rel. Keane v. Board of Review of City of Milwaukee*, 99 Wis. 2d 584, 299 N.W.2d 638 (Ct. App. 1980).   But as Lowe's acknowledges, that case simply reaffirmed the conclusion in *Northwestern Mutual Life Insurance Co. v. Weiher*, 177 Wis. 445, 188 N.W. 598 (1922).   Specifically, *Keane* cited *Northwestern Mutual* in rejecting an assessment based on the property's "intrinsic value," namely, special leasehold improvements valuable to the lessee.   *See Keane*, 99 Wis. 2d at 597.   Amicus curiae Wisconsin Manufacturers & Commerce also stresses that an assessment must be based only on the market value of the subject property's fee simple interest.   We agree, but reject the contention that the assessments at issue here were based on the intrinsic value of the building to Lowe's or on the value of Lowe's ongoing business, as it has no basis in the record.

¶63    In sum, Lowe's has not established that the circuit court erred in weighing the expert testimony in favor of Landretti's cost approach.

*C. Tier III Income Approach*

¶64    Lowe's contends that the circuit court erred in failing to evaluate MaRous's calculations under the Tier III income approach. As stated, the court found that Landretti's opinion under the cost approach "was based on market evidence of demand for big box stores in the Plover area, as well as a highest and best use analysis. It provides the best estimate of the fee simple value of the property on the dates of value and is supported by Landretti's other Tier 3 analysis." After determining the cost approach to be the "best estimate" of the property's value, the court did not detail its reasoning for rejecting Lowe's' income approach. Lowe's argues that "[t]he failure to consider admitted evidence of one of the three major valuation approaches as potentially significant contrary evidence that rebuts the assessments at issue is error."

¶65    The circuit court found Landretti's analysis under the cost approach to be more persuasive than MaRous's analysis under the income approach, and it explained why it found the cost approach most persuasive. Lowe's cites no authority for its three-sentence assertion that the court was required to make findings or conclusions regarding the Tier III income approach when it found that Landretti provided the most credible analysis under the Tier III cost approach. Thus, we do not further consider Lowe's' argument on this point. *See* ***Pettit***, 171 Wis. 2d at 646-47.[12]

---

[12] We note that Lowe's' brief also contains arguments that are based on a mischaracterization of the *Property Assessment Manual* and the record. For example, Lowe's

(continued)

**CONCLUSION**

¶66     Based on the foregoing, we conclude that Lowe's has not overcome the presumption of correctness that attached to the Village's assessments and that the record supports the circuit court's determinations in this case. Accordingly, we affirm the circuit court's order upholding the assessments.

*By the Court.*—Order affirmed.

Not recommended for publication in the official reports.

---

cites the *Property Assessment Manual* for its assertion that the Tier III cost approach is a method "typically appropriate for new and special purpose properties." In so arguing, Lowe's omits the other half of this sentence in the *Property Assessment Manual*. The full sentence reads: "[Assessors] typically use the cost approach in cases of new or special purpose structures or where limited sales or rental data activity exist." *Wisconsin Property Assessment Manual*, at 7-24. Another example of Lowe's' mischaracterization is its statement that "[t]he circuit court erroneously concluded that no functional or economic obsolescence should be accounted for in the cost approach." However, both the circuit court's decision and the record make clear that functional and economic obsolescence was accounted for in Landretti's cost approach methodology. In fact, in addressing Landretti's cost approach, the court specifically found: "Landretti used the Economic Age-Life Method to arrive at an annual depreciation rate of 2.9% over the subject property; with the effective age of Lowe's in 2016/2017 of 10 years, for a total of 29%." The court further found that "Landretti opined that the property did not have any abnormal *functional obsolescence* or *economic obsolescence* and, therefore, did not make a deduction for those forms of obsolescence." With regard to Landretti's application of the cost approach, the court found that "[Landretti's] analysis in his report (Exhibit 119, p 72-75), along with the testimony at trial is reasonable and credible, and, therefore, the Court accepts it."