COURT OF APPEALS
DECISION
DATED AND FILED

February 11, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP1585**

STATE OF WISCONSIN

Cir. Ct. No. 2014CV3776

IN COURT OF APPEALS
DISTRICT I

---

MAYFAIR MALL LLC,

PLAINTIFF-APPELLANT,

V.

CITY OF WAUWATOSA,

DEFENDANT-RESPONDENT.

---

APPEAL from an order of the circuit court for Milwaukee County: CHRISTOPHER R. FOLEY, Judge. *Affirmed*.

Before White, C.J., Donald, P.J., and Geenen, J.

Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).

¶1     PER CURIAM.   Mayfair Mall LLC ("Mayfair") appeals from an order of the remand court[1] concluding that the property tax assessments of Mayfair Mall (the "Mall"), as determined by the City of Wauwatosa (the "City") for 2013, 2014, and 2015 (the "Assessments"), were not excessive.  We affirm.

## BACKGROUND

¶2     Mayfair sued the City for a property tax refund under WIS. STAT. § 74.37, claiming that the Assessments of the Mall were excessive.  A court trial was held over the course of twenty-nine days.  The parties presented the testimony and reports of several appraisal experts, including, among others, two appraisers retained by Mayfair, Paul Bakken and Richard Marchitelli; and two appraisers retained by the City, Mark Kenney and William Miller.  A financing appraisal commissioned in 2013 by Mayfair's lender was also included in the evidence (the "Financing Appraisal").

¶3     After the close of evidence, the circuit court concluded that none of the Assessments were excessive, and Mayfair appealed.  We concluded that the

---

[1]  The Honorable Marshall B. Murray presided over the bench trial and issued findings of fact and conclusions of law concluding that the City's assessments were not excessive.  We refer to Judge Murray as the circuit court.  Mayfair appealed and this court remanded the case to the circuit court for additional fact finding.  *Mayfair Mall LLC v. City of Wauwatosa*, No. 2019AP1232, unpublished slip op. ¶30 (WI App May 18, 2021).

On remand, Mayfair filed a request for substitution of Judge Murray, and the case was reassigned to the Honorable Christopher R. Foley.  Judge Foley appointed an expert under WIS. STAT. § 907.06 (2021-22), held an evidentiary hearing, and issued the order underlying the instant appeal concluding that the City's assessments were not excessive.  We refer to Judge Foley as the remand court.

For ease of reading and because the relevant statutory language has not changed over the course of this litigation, all references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

findings of the circuit court were insufficiently detailed for us to determine whether Mayfair had overcome the presumption of correctness, so we reversed and remanded the case for further fact finding "that include[d] the bases and reasoning upon which the [circuit] court's findings of fact and conclusions of law [were] based[.]" *Mayfair Mall LLC v. City of Wauwatosa*, No. 2019AP1232, unpublished slip op. ¶30 (WI App May 18, 2021).

¶4    On remand, the remand court appointed an expert under WIS. STAT. § 907.06, Dr. Mark Eppli, to assist it in fulfilling our mandate. The remand court held an evidentiary hearing at which Dr. Eppli testified. The remand court concluded, as did the circuit court, that none of the Assessments were excessive.

¶5    Mayfair appeals. Additional factual details will be discussed as they become relevant.

## DISCUSSION

### I.    Standard of Review and Legal Principles

¶6    Mayfair contends that the Assessments were excessive, and that the circuit court and remand court opinions adopting the City's valuation were clearly erroneous. Mayfair argues that the courts erred in the treatment of development costs related to the Nordstrom store. It makes various arguments that the courts erred when they relied on the Financing Appraisal that was based on the leased fee value of the Mall. Additionally, Mayfair challenges the underlying assumptions of various appraisals, raising issues with the deduction of management costs and property taxes, the remand court's finding that actual rental rates reflected the market rental rates, and the remand court's reliance on Dr. Eppli's capitalization rate. Mayfair also contends that Dr. Eppli is not an expert and his testimony and

reports should be excluded. Finally, we consider Mayfair's argument that, in a valuation dispute, ***Regency West***[2] prohibits a court from relying on appraisals that are higher than the assessed value. We reject Mayfair's arguments.

¶7 Mayfair brought this action against the City under WIS. STAT. § 74.37, claiming that it was entitled to partial property tax refunds because the Assessments were excessive in violation of WIS. STAT. § 70.32. When presented with excessive assessment claims under WIS. STAT. § 74.37, we review the circuit court's determination and not the determination of the taxing district's Board of Assessors or Board of Review. ***Lowe's Home Ctrs., LLC v. City of Delevan***, 2023 WI 8, ¶23 & n.11, 405 Wis. 2d 616, 985 N.W.2d 69. The Assessments are entitled to a presumption of correctness under WIS. STAT. § 70.49(2) that "may be rebutted if the assessor did not correctly apply the [Wisconsin Property Assessment] Manual [the "WPAM"] and Wisconsin statutes or if a challenger presents significant contrary evidence."[3] ***Lowe's Home Ctrs.***, 405 Wis. 2d 616, ¶32. Whether the Assessments complied with statutory directives is a question of

---

[2] ***Regency West Apartments LLC v. City of Racine***, 2016 WI 99, 372 Wis. 2d 282, 888 N.W.2d 611.

[3] Throughout their briefs, the parties argue about whether the circuit and remand courts properly applied the presumption of correctness. Specifically, Mayfair argues that the presumption of correctness attaches only to the assessment amount and not to the methodology and data used by the assessor to calculate it (e.g., the decision whether to deduct the Nordstrom development costs and the calculation of the Mall's net operating income). In our view, the presumption of correctness must apply both to the assessment amount and to the assessor's method of calculating the assessment. It would be illogical to presume that an assessment amount is correct without presuming that the methods and data used to calculate it were also correct (i.e. lawful). When an assessment is entered into the assessment roll, the amount is presumed correct and the assessor is presumed to have complied with the WPAM and Wisconsin law. ***Lowe's Home Ctrs., LLC v. City of Delevan***, 2023 WI 8, ¶¶35-38, 405 Wis. 2d 616, 985 N.W.2d 69. Taxpayers can rebut the presumption and have the assessment set aside by showing that the assessment did not comply with the WPAM, resulting in an excessive assessment, or by showing significant contrary evidence. ***Id.*** at ¶¶35-39.

law that we review independently, but the circuit court's factual findings will not be disturbed unless they are clearly erroneous, i.e., "against the great weight and clear preponderance of the evidence," because "[i]t is within the province of the factfinder to make determinations of the weight and credibility of evidence." *Id.*, ¶¶24-25, 68-69.

¶8 Mayfair claims that the Assessments were excessive in violation of WIS. STAT. § 70.32(1). Section 70.32(1) states that "[r]eal property shall be valued by the assessor in the manner specified in the [WPAM] … from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale." "Full value" in the statute has been interpreted to mean "fair market value." *Flood v. Village of Lomira, Bd. of Rev.*, 153 Wis. 2d 428, 435, 451 N.W.2d 422 (1990). Section 70.32(1) lists three sources of information used to determine a property's fair market value for tax assessment purposes. "The order in which these sources are listed is indicative of the quality of information each source provides," and this methodology has been described as providing three "tiers" of analysis.[4] *Lowe's Home Ctrs.*, 405 Wis. 2d 616, ¶28.

¶9 This case concerns the third tier of analysis under which the assessor "may consider all the factors collectively that have a bearing on the value of the property," including "cost, depreciation, replacement value, income, industrial

---

[4] A tier one analysis examines recent arm's-length sales of the subject property as the best information of a property's fair market value. *Lowe's Home Ctrs., LLC v. City of Delevan*, 2023 WI 8, ¶29, 405 Wis. 2d 616, 985 N.W.2d 69. If the property has not been recently sold, the appraiser moves to a tier two analysis, examining arm's-length sales of reasonably comparable properties. *Id.* On appeal, neither party argues that a tier one or tier two analysis should have been used by the City's assessors in this case. We therefore discuss them no further.

conditions, location and occupancy, sales of like property, book value, amount of insurance carried, value asserted in a prospectus, and appraisals produced by the owner." *Id.*, ¶30. As relevant here, "the income approach, 'which seeks to capture the amount of income the property will generate over its useful life,' fits under the umbrella of tier [three] analysis." *State ex rel. Collison v. City of Milwaukee Bd. of Rev.*, 2021 WI 48, ¶26, 397 Wis. 2d 246, 960 N.W.2d 1 (quoting *Metropolitan Assocs. v. City of Milwaukee*, 2018 WI 4, ¶34, 379 Wis. 2d 141, 905 N.W.2d 784).

## II. Nordstrom Development Costs

¶10 In the fall of 2012, Mayfair announced that Nordstrom, Inc., ("Nordstrom") would open and operate a Nordstrom department store at the Mall. Mayfair indicated it would spend approximately $70 million on improvements and renovations to the Mall in preparation for the store. That Nordstrom was coming to the Mall was known to market participants as of January 1, 2013, although construction did not begin until fall of 2014.

¶11 Mayfair argues that the City improperly assumed the benefits of the addition of a Nordstrom store when assessing the Mall's value (e.g., raising the class of the Mall and lowering its capitalization rate) without accounting for the costs associated with those benefits. Mayfair claims that the failure to deduct the Nordstrom development costs when calculating the Mall's net operating income ("NOI") violates the principle of anticipation articulated in the WPAM.

¶12 We reject Mayfair's argument because it cites no legal authority to support it, and instead relies solely on the principle of anticipation as described in the WPAM. It reads, in full:

> One definition of value is the present worth of anticipated future benefits. These future benefits can be the amenities of home ownership, the receipt of an income, a place to run a business, or any other benefits that may be projected. It is in the conversion of anticipated future benefits into a present value that is the basis of the valuation of property in the income approach.

WPAM 7-14 (2013).[5] Nothing in this section directs assessors to deduct all costs associated with anticipated future benefits under every valuation approach. *See State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶¶44-46, 271 Wis. 2d 633, 681 N.W.2d 110.

¶13 Indeed, the evidence that the remand court found credible showed that, under a direct capitalization approach,[6] it is not appropriate to deduct the Nordstrom development costs because Mayfair expected a return on that investment. It distinguished these development costs from deferred maintenance costs, which are commonly deducted from the value of the property being assessed. Dr. Eppli explained the difference between the treatment of development costs and deferred maintenance costs, and why it was inappropriate to deduct the Nordstrom development costs when calculating the Mall's NOI:

> For properties with significant deferred maintenance, it is common acquisition and valuation practice to reduce the value of the property by the deferred capital expenditure that the next buyer is likely to incur to maintain the property income stream. For instance, if a mall escalator or roof needs imminent replacement, the buyer/appraiser appropriately reduces the purchase price/valuation by that deferred maintenance capital expenditure amount.

---

[5] The language is the same in both the 2014 and 2015 versions of the WPAM.

[6] The direct capitalization approach is a type of tier three income approach that "converts a single year's net operating income into an estimate of value." WPAM 9-14, 9-15 (2013) (describing how to apply the approach).

> ….
>
> …The argument Bakken [Mayfair's appraiser] makes for reducing the market value by the Nordstrom improvements is that the addition of Nordstrom's is a defensive move necessitated by market conditions and that no additional revenue stream would be realized by the taxpayer, analogizing the expenditures on Nordstrom's to the necessary costs to replace a roof where the property income stream and property value is maintained but not grown.

¶14 Dr. Eppli then refuted Bakken's argument that the Nordstrom development costs can be deducted as deferred maintenance by citing Mayfair's expected increase in income—Mayfair expected an 8% return due to the Nordstrom expansion—and noting that "the presence of Nordstrom's explains much of the growth on inline tenant income from 2015 to 2016," when the NOI had been "effectively stagnant for the years 2011-2015, pre-Nordstrom's[.]" Dr. Eppli opined that even if the Mall saw no income growth attributable to the Nordstrom expansion, a scenario he described as "unlikely," the Mall would experience a risk reduction by having Nordstrom as an anchor tenant, solidifying itself as a Class A mall and shrinking the applicable capitalization rate used to calculate NOI.[7]

¶15 Dr. Eppli concluded that "[r]educing the property price by the Nordstrom's improvement costs falls well outside of normal and customary as the property NOI will likely benefit from additional inline tenant sales and rent and

---

[7] Dr. Eppli explained during the hearing that a direct capitalization approach requires the determination of an appropriate market-based capitalization rate. The capitalization rate determination is based, in part, on the mall's class designation: higher class malls are assigned lower capitalization rates resulting in higher property values, whereas lower class malls are assigned higher capitalization rates resulting in lower property values.

have increased value attributable to a lower capitalization rate." The circuit court "fully agree[d]" with Dr. Eppli's analysis.

¶16 Mayfair argues that Dr. Eppli contradicted his report when he testified that a buyer would take the Nordstrom development costs into account when negotiating a purchase price for the Mall. However, a close examination of Dr. Eppli's testimony reveals that he did not contradict his report. He explains that, in a tier two sales comparison approach like the one conducted in City appraiser Kenney's first appraisal,[8] it is appropriate to deduct capital expenditures like the Nordstrom development costs. However, Dr. Eppli further explained that it is not appropriate to deduct those costs in a "tier three [direct] cap[italization] rate approach" like the one conducted in Kenney's second report, which does *not* deduct the Nordstrom development costs. At least insofar as the direct capitalization approach is concerned, which was the approach found credible by the remand court, all of the City's experts and Dr. Eppli agreed that the Nordstrom development costs should not be deducted.

¶17 Accordingly, we reject Mayfair's argument that the failure to deduct the Nordstrom development costs violated Wisconsin law or the WPAM. The remand court's finding that the Nordstrom development costs should not be deducted in calculating the Mall's NOI is not "against the great weight and clear preponderance of the evidence." ***Lowe's Home Ctrs.***, 405 Wis. 2d 616, ¶25.

---

[8] Kenney later withdrew this appraisal report and replaced it with a second that performed a tier three direct capitalization approach.

### III.    Leased Fee Value and Market Rent

¶18    The circuit court and remand court opinions relied on appraisals that calculated the Mall's leased fee value as opposed to its fee simple value.  Mayfair argues that the courts' reliance on those appraisals was erroneous.  Citing *Walgreen Co. v. City of Madison*, 2008 WI 80, ¶45, 311 Wis. 2d 158, 752 N.W.2d 687, Mayfair claims that leases have no role to play in valuing a property for tax assessment purposes because assessments must be based on the fee simple interest of the property, and leases are not part of the bundle of rights to be assessed.

¶19    Mayfair misunderstands *Walgreen* and omits a critical section of the opinion that resolves the "leased fee" versus "fee simple" issue as it applies to this case.  In *Walgreen*, it was undisputed that the rents involved in that case were above market.  The issue was "whether a property tax assessment of retail property leased at above market rent values should be based on market rents (as Walgreens argues) or if such assessments should be based on the above market rent terms of Walgreens' actual leases (as the City [of Madison] argues)."  *Id.*, ¶2.  The court concluded that, when conducting a tier three income approach of a leased retail property, the assessment must "be based on market lease rates, not actual contract rates," *id.*, ¶3, because Wisconsin law "proscribes assessing real property in excess of market value."  *Id.* (citation omitted).

¶20    The *Walgreen* court "made a narrow determination regarding how above-market rent is to be treated for tax assessment purposes."  *Lowe's Home Ctrs.*, 405 Wis. 2d 616, ¶52.  In doing so, it clarified that "'[i]f the contract rents are at market levels, the leased fee interest is the same as a fee simple interest.'"  *Walgreen*, 311 Wis. 2d 158, ¶10 n.5 (citing WPAM).  The remand court correctly

recognized that leased fee values and fee simple values are the same if the rents are market rate.

¶21    The question, then, is not whether the circuit and remand courts erred by relying on appraisals that calculated the Mall's leased fee value as opposed to its fee simple value.  The question is whether the actual rents were above market rate.  If the actual rents are market rate, then a leased fee value calculated using actual rents would be the same as a fee simple interest.  *See id.*

### A. The circuit court's finding of fact that the Mall's actual rents were market rate is not clearly erroneous.

¶22    Mayfair argues that the record does not support the circuit court's finding that the Mall's actual rents were market rate.  Mayfair complains that the evidence the circuit court relied on supports the opposite conclusion, i.e., that the Mall's actual rents were above market.

¶23    Mayfair says that the Financing Appraisal, the valuations by its appraisers Bakken and Marchitelli, and even the City's appraiser Kenney, all agreed that rent was above market.  Mayfair says that Dr. Eppli, on whom the remand court relied and found credible, agreed that rents were above market and that Marchitelli's approach using hypothetical rents (calculated as 15% of a tenant's retail sales) was credible.

¶24    Mayfair is cherry-picking facts.  For example, Kenney performed multiple different analyses across two appraisal reports (the first of which was withdrawn and replaced with the second) and testified for over a week.  Kenney's purported agreement that the Mall's rents were above market is taken from a small segment of Kenney's cross-examination when he was questioned about the direct

11

cash flow analysis contained in the withdrawn report. However, Kenney performed a direct capitalization analysis in his second report, and in that report, he concluded that the rents were market rate. When asked directly if he had an opinion as to whether the Mall's leased fee value was the same as its fee simple value, Kenney replied that the "the rents are at market and therefore, we are looking at lease fee interest being equal to fee simple."

¶25 Mayfair also misrepresents Dr. Eppli's report to suggest that he "agreed" with Marchitelli regarding market rate rent at the Mall. Dr. Eppli explained that although Marchitelli's process of looking at tenant occupancy costs was sound, Marchitelli's actual calculations were inaccurate in this case. Marchitelli did not determine market rent based on actual market data—that is, the rents that Mall tenants actually paid Mayfair, but instead calculated a hypothetical rent by assuming that market rent would be 15% of the retail sales of the Mall's tenants. Rather than agreeing with it, Dr. Eppli criticized Marchitelli's calculation because "what the tenants are actually paying" is better information to arrive at market rent "as opposed to pretending that they're paying 15 percent of their retail sales[.]" Dr. Eppli opined that Marchitelli applied biased and skewed data, and as a result, his "hypothetical rents" understated actual rents by between five and six million dollars per year.

¶26 With respect to the Financing Appraisal, Mayfair again misrepresents the record. Using a rent-to-sales ratio analysis, the Financing Appraisal calculated an average market rental rate of between $32.50 and $37.50 per square foot. It determined that the "overall attained rent" for the Mall was $50.28 per square foot based upon all leases in place. However, Mayfair ignores that the Financing Appraisal specifically includes the "net effective" rent "that represents the net effective rent for the tenants in place, as several tenants pay on a

gross, or modified rent structure." The net effective rent for tenants at the Mall was calculated to be $29.27 per square foot, well below the Financing Appraisal's average market rate calculation.

¶27 The remand court found that the Mall was a "rental market [u]nto itself and existing contract rents represent market rents." The record is replete with evidence supporting this finding. Kenney testified unequivocally that the Mall's rents were market rate, and Dr. Eppli explained in detail, in his report and in his testimony, why the Mall generates its own unique market rate:

> [M]alls generate … their own market rent in the unique spaces that are provided within that mall…. Data coming from recently signed leases and not third-party source[s] is the best market data if recent leases have been contracted.
>
> Every single space within a mall is likely to have its own market rent. The second floor's different from the first floor, being proximate to Apple is—is different from being down, let's say, a dead corridor on the way out to the parking structure.
>
> [E]ach one of those spaces likely have a different ability to lease at a different rate depending also on the type of tenant you're likely to put into that space as well. Tenant mix matters.
>
> Actual rents are reflective of market rents.

¶28 We conclude that the circuit court's finding that the Mall's actual rents were market rate was not clearly erroneous because the finding is well-supported in the record. "It is within the province of the factfinder to make determinations of the weight and credibility of evidence." *Lowe's Home Ctrs.*, 405 Wis. 2d 616, ¶25.

13

**B. Property taxes and management fees were properly taken into account.**

¶29     Mayfair argues that the Financing Appraisal upon which the circuit and remand courts relied failed to account for property taxes in violation of the WPAM, resulting in an excessive assessment.  It claims that the WPAM requires assessors to add the tax rate to the capitalization rate (referred to as "loading the cap rate") to account for property taxes because future taxes will be based on the appraised value.

¶30     Mayfair is correct that the WPAM directs assessors to account for property taxes under a tier three income approach, but it incorrectly asserts that loading the cap rate is the only way to properly account for property taxes.  For example, property taxes can be accounted for by listing them as an expense when calculating NOI.  The WPAM shows by example that the same property value is reached whether the assessor loads the cap rate or whether the assessor includes the amount of property taxes as an expense in the operating statement.  WPAM 9-26 through 9-27 (2013).[9]  Moreover, Dr. Eppli testified that using actual income and expenses to calculate NOI, including actual property taxes and tenant reimbursements, was "the normal course" of accounting for property taxes.

¶31     Mayfair argues that Dr. Eppli's reliance on the Mall's actual income and expenses for the assessment periods violated the WPAM and Wisconsin law because the Mall's NOI for any given assessment period is not known until after

---

[9] The same example is provided in the 2014 and 2015 versions of the WPAM.

14

the assessment date. Mayfair points to the Principle of Change detailed in the WPAM for support:

> The factors that affect market value are constantly changing. Not only are economic, social and government forces constantly changing, but the property itself is subject to change. Because change is constant, every opinion of value is meaningful only in the context of the date to which is [sic] applied. In Wisconsin, assessment values are always as of January 1. Any changes to the property, economy, or any other financial factors affecting value that occur after that date, are not considered until the following assessment cycle.

WPAM 7-14 (2013).[10]

¶32 Mayfair misunderstands the Principle of Change. An assessor's reliance on actual income and expenses for an assessment period is backward looking as of the assessment date, even if all of the data for the entire assessment period is not available until after the assessment date; it therefore does not include any "financial factors affecting value that occur after" the assessment date because the property's actual income and expenses during an assessment period are experienced before the assessment date. Additionally, Wisconsin law requires that assessors base assessments on the "best information that the assessor can practicably obtain," WIS. STAT. § 70.32(1), and Dr. Eppli explained that using actual income and expenses better accounts for increased property taxes and any corresponding increases in reimbursements from tenants.

¶33 Mayfair complains that the appraisals and evidence relied upon by the circuit and remand courts failed to deduct the Mall's management fees, resulting in excessive assessments. Specifically, Mayfair says that Dr. Eppli relied

---

[10] The language is the same in both the 2014 and 2015 versions of the WPAM.

on the Mall's "CORE NOI" from Bakken's report, and this figure did not include management fees as an expense, resulting in an overstatement of the Mall's income and an excessive assessment.

¶34    In challenging the treatment of management fees, Mayfair places too great an emphasis on the remand court's general reliance on Dr. Eppli, and ignores that the remand court's conclusions were supported by other witnesses' testimony and evidence.  For example, both the circuit and remand courts relied on Kenney in determining that the Assessments were not excessive, and Kenney's direct capitalization approach *did* deduct management fees.  Indeed, Dr. Eppli confirmed that the Mall's actual operating statements reflected a management fee for 2013-2015, and Kenney deducted those fees in his direct capitalization approach because he relied on the Mall's historical reported expenses.

¶35    In sum, the circuit court's finding that property taxes and management fees were properly taken into account is support by the record and not clearly erroneous.  *See Lowe's Home Ctrs.*, 405 Wis. 2d 616, ¶25.

### C. The capitalization rate adopted by the circuit court was not clearly erroneous.

¶36    In its next argument contesting the City's valuation, Mayfair contends that the circuit court applied an unreasonable capitalization rate in determining the Mall's fair market value.  Specifically, Mayfair says that although the remand court heavily relied on Dr. Eppli in its decision, it refused to adopt Dr. Eppli's proposed capitalization rates.

¶37    We reject Mayfair's argument.  A direct capitalization approach requires the appraiser to determine an appropriate market-based capitalization rate.

This determination is made, in part, by a mall's class designation: a designation in a higher class corresponds to a lower capitalization rate, resulting in higher property values, whereas a lower class designation corresponds to a higher capitalization rate and results in lower property values.

¶38 Here, the remand court found the Mall to be a Class A mall, and this finding is well-supported in the record. For example, Mayfair's own SEC filings and representations to shareholders acknowledge that the Mall is a Class A mall. Notwithstanding that the Mall was a Class A mall, the remand court instead decided to apply a blended capitalization rate that closely aligned with the City assessor's rate by averaging the capitalization rates for Class A and B+. The use of a blended capitalization rate is supported by the evidence. Dr. Eppli pointed out that the location of the Mall in Southeast Wisconsin could possibly make the Mall "less than a Class A mall" meaning at the "bottom of the 'A' and top of the 'B+' mall markets."

¶39 Accordingly, we conclude that the circuit court's adoption of a blended capitalization rate was reasonable and not clearly erroneous. *See Lowe's Home Ctrs.*, 405 Wis. 2d 616, ¶25.

## IV. Challenges to Dr. Eppli

¶40 Mayfair makes several challenges to Dr. Eppli's testimony and opinions. First, Mayfair argues that Dr. Eppli was not qualified to provide his opinions because he has never prepared an appraisal report and was not a licensed appraiser or assessor. Additionally, Mayfair complains that it was unable to depose Dr. Eppli before trial because of tight scheduling caused by the impending retirement of the remand court. Finally, Mayfair says that Dr. Eppli failed to

comply and was unfamiliar with the Uniform Standards of Professional Appraisal Practices ("USPAP").

¶41    As to the challenges to Dr. Eppli's qualifications and purported lack of opportunity to depose Dr. Eppli, we reject Mayfair's arguments as forfeited. "Forfeiture is the failure to timely assert a right." *State v. Coffee*, 2020 WI 1, ¶19, 389 Wis. 2d 627, 937 N.W.2d 579. "Under the forfeiture rule, a defendant may forfeit a right if the defendant fails to object at the time the right is violated."[11] *Id.* By failing to timely object to Dr. Eppli's appointment based on his lack of qualifications and by not requesting a deposition prior to the evidentiary hearing, Mayfair has forfeited these issues. *See id.*

¶42    As to Mayfair's complaint that Dr. Eppli's report is not USPAP compliant, we observe that the WPAM does not require strict compliance with USPAP. The WPAM (2015) reads:

> USPAP is a set of property appraisal standards that were developed primarily for transactions regulated by the federal government. Assessors can refer to USPAP for

---

[11] The forfeiture rule fosters the fair, efficient, and orderly administration of justice. Our supreme court explained:

> The purpose of the "forfeiture" rule is to enable the circuit court to avoid or correct any error with minimal disruption of the judicial process, eliminating the need for appeal. The forfeiture rule also gives both parties and the circuit court notice of the issue and a fair opportunity to address the objection; encourages attorneys to diligently prepare for and conduct trials; and prevents attorneys from "sandbagging" opposing counsel by failing to object to an error for strategic reasons and later claiming that the error is grounds for reversal.

*State v. Ndina*, 2009 WI 21, ¶30, 315 Wis. 2d 653, 761 N.W.2d 612.

> guidance, however, Wisconsin statutes, case law and the [WPAM] contain the standards and practices required of Wisconsin assessors. DOR is rescinding the requirement that assessors comply with USPAP, retroactive to January 1, 2013.

WPAM 1-2 (2015).[12] Therefore, even if Dr. Eppli's report is not USPAP compliant, that fact does not invalidate his opinions or make it erroneous for the remand court to have relied upon them.

¶43 Mayfair complains that Dr. Eppli used information outside the record to produce his report, and he did not provide that information to Mayfair prior to the evidentiary hearing. However, Dr. Eppli testified that the only information he considered that was outside the record was used to respond to the specific question asked by the remand court about the reasonableness of the increase in the assessment between 2012 and 2013. Dr. Eppli's report includes the data and information he relied upon to answer the remand court's question.

¶44 In sum, we reject Mayfair's arguments challenging Dr. Eppli's testimony and opinions.

## V. *Regency West* and Appraisals Exceeding the Challenged Assessments

¶45 Mayfair argues that the opinions of the City's experts as to the value of the Mall should have been excluded from evidence and not considered by the

---

[12] The Wisconsin Department of Revenue ("DOR") had previously planned on requiring assessors to comply with certain USPAP provisions by 2012, but that deadline was extended to 2013 "with the understanding that 2013 was to be a year of cooperative learning on USPAP." WPAM 1-1 (2015). However, after input received from assessors, municipal officials, and DOR staff after the year of cooperative learning concluded, DOR determined that USPAP standards should be treated as guidance for assessors, and it rescinded the requirement that assessors comply with USPAP retroactive to 2013. WPAM 1-2 (2015).

circuit or remand courts because those experts appraised the Mall at a value higher than those in the Assessments. Mayfair claims that this result is compelled by our supreme court's opinion in *Regency West Apartments LLC v. City of Racine*, 2016 WI 99, 372 Wis. 2d 282, 888 N.W.2d 611.

¶46   We reject Mayfair's arguments. First, Mayfair has forfeited this issue because it failed to timely object to the admission of the City's expert reports during the bench trial. *See Coffee*, 389 Wis. 2d 627, ¶19. Second, Mayfair misreads *Regency West* and its subsequent clarification in *Metropolitan Associates*, 379 Wis. 2d 141.

¶47   In *Regency West*, the court stated in a footnote: "We do not consider the appraisals of [appraisers for the City of Racine] because their appraisals exceeded the valuations of Racine for both 2012 and 2013." *Id.*, 372 Wis. 2d 282, ¶57 n.19. The court cites *Trailwood Ventures, LLC v. Village of Kronenwetter,* 2009 WI App 18, ¶¶12-13, 315 Wis. 2d 791, 762 N.W.2d 841, as support, explaining that "a taxation district that has accepted the payment it requested has agreed that its taxation value is the maximum value that it may seek" and "WIS. STAT. § 74.37 permits a refund to the taxpayer or may uphold the status quo, but there is no authority for deficiency judgments." *Regency West*, 372 Wis. 2d 282, ¶57 n.19.

¶48   In *Metropolitan Associates*, the court revisited the *Regency West* footnote in the context of mass appraisals. In response to the very same argument Mayfair is making in the instant case (i.e., that assessments cannot be defended by appraisals where the appraised value exceeds the assessed value), the *Metropolitan Associates* court stated that this interpretation of *Regency West* "would mean that an assessor would be unable to defend an assessment if the

value he or she derived in a single property appraisal exceeded the initial mass appraisal assessment."[13] *Metropolitan Assocs.*, 379 Wis. 2d 141, ¶64 n.15. This result is "absurd," the court says, because the ultimate question to be resolved when a taxpayer challenges an initial assessment "is not whether the initial assessment was incorrect, but whether it was excessive." *Id.*

¶49    Mayfair argues that the interpretation of *Regency West* set forth in *Metropolitan Associates* is limited to contexts where single property appraisals are used to defend mass appraisals, but we disagree. *Metropolitan Associates* emphasized that the ultimate question in a tax assessment challenge is whether the assessment is *excessive*, not simply that the assessment is incorrect, and appraisals where the value of the property exceeds its assessed value tend to support the conclusion that the assessment is not excessive.

¶50    We agree with the City that the language of footnote 19 of *Regency West* means that, in excessive assessment claims under WIS. STAT. § 74.37, a court is not able to increase an assessment to bring it in line with an expert's appraised value if the appraised value is greater than the assessed value. It does not prevent those appraisals from being used as evidence that the challenged assessments are not excessive. Accordingly, we reject Mayfair's argument that *Regency West* required the exclusion of the City's expert reports and opinions from evidence.

---

[13] The property in *Metropolitan Associates* was assessed using mass appraisal, and the WPAM "dictates that a mass appraisal, if challenged, be defended with a single property appraisal." *Metropolitan Assocs. v. City of Milwaukee*, 2018 WI 4, ¶64 n.15, 379 Wis. 2d 141, 905 N.W.2d 784.

## CONCLUSION

¶51     For the foregoing reasons, the order of the remand court is affirmed.

*By the Court.*—Order affirmed.

This opinion will not be published.   *See* WIS. STAT. RULE 809.23(1)(b)5.